WHITCHER, ET AL. v. WADDELL
(No. 1642; Nov. 19, 1930; 292 Pac. 1091)

275

The cause was submitted for the appellants on the brief of *W. K. Somers,* of Moorcroft, Wyoming, and *John T. Heffron,* of Deadwood, S. D.

The cause was submitted for respondents on the brief of *E. E. Wakeman,* of Gillette, Wyoming, and *E. C. Raymond,* of Newcastle, Wyoming.

*W. K. Somers* and *John T. Heffron,* in reply.

BLUME, Chief Justice.

On December 15, 1920, William G. Oelkers owed the Bank of Moorcroft the sum of $27,800 represented by notes, secured by mortgages on real estate and on cattle to the number of about 350. Part of the notes, the amount not appearing, had been transferred to the Livestock National Bank of Omaha, and that bank had the first lien on the cattle. Oelkers became apparently insolvent, and on the date above mentioned transferred his property, including about 350 head of cattle, to the bank. The transfer was direct to D. R. Shackleford, but the testimony shows that he was merely the agent of the bank. It was necessary

to feed these cattle during the winter, and though the Livestock National Bank had the first lien, there is nothing in the record to justify the statement of appellant that such feeding would be solely for the benefit of that bank. The value of the cattle, or the equity of the Moorcroft bank, does not appear. But the bank officials evidently thought that the latter was sufficiently large to justify them in caring for the cattle and incurring the necessary expense in that connection. The testimony shows that in order to keep a satisfactory record of these expenses, it was determined to keep a special account thereof, and carry that in the name of ''Bert Waddell, Special;'' and in order to raise an ''apparent'' fund against which to check, to have Mr. Waddell give notes, with which the account should be credited. This was done, from time to time, some of the notes being taken up as expenses were incurred, and replaced by others, of larger amounts, so as not to have too many notes. The last notes so given are the three notes in suit, one for the principal sum of $2000, dated June 16, 1921, due in 90 days from date; one for $500, dated July 11, 1921, and one for $250, dated July 12, 1921, both due 60 days after date. All were in the regular form of negotiable notes, given to the ''Moorcroft Bank,'' signed ''Bert Waddell, Special a/c,'' and the fact was noted thereon that they were for the expenses of the cattle above mentioned, and for some sheep, also later taken over by the bank in similar manner as the cattle. To the notes was appended the following memorandum:

''The Moorcroft Bank took over a mortgage from Wm. Oelkers covering 350 head of cattle. These cattle were put out for wintering purposes with Al Andrews. He bought hay from W. H. Colquhoun that amounted to about $400.00. He bought hay from Adolph Lamb to the amount of about $100.00. There has been some other expense on these cattle and the total expense on the cattle will amount to somewhere between $500.00 to $2000.00.

This account is run in the Moorcroft Bank in the name of Bert Waddell, Special, and all notes that he would sign

in favor of the Moorcroft Bank under this account, not exceeding the sum of $2000.00, would not be chargeable to his personal account, but to the expense account of the Moorcroft Bank, as the Moorcroft Bank owns the cattle.

This is simply a memorandum of information for all parties concerned.

MOORCROFT BANK.

D. R. Shackleford,           S. A. Guthrie, Pres.
Secy.''

The limit of $2000 here mentioned, so the testimony shows, was exceeded, by reason of the fact that later, as already stated, some sheep had to be taken over by the bank and cared for the same as the cattle and the expenses incurred in that connection were handled in the same account. It is further shown that the State Examiner, through his deputies, was informed of this arrangement and it was approved by him. Some of the cattle were finally shipped, and the remainder sold, and by reason of their depreciation in the meantime, it is doubtful, though the record is not clear, whether any of the proceeds went into the hands of the bank or its receiver. Some money, just how much is not clear, was, however, received from the sheep and paid into the bank or its receiver, and credited to the special account above mentioned. The bank became insolvent in August, 1921, and Thomas Dunn was appointed receiver. He was succeeded in the summer of 1923 by J. E. Ford, who about December, 1924, made a report to the court and in which he listed the notes in suit as part of the assets in his hands. He sold these notes—perhaps among other assets—to L. H. Robinson ''for some consideration,'' according to the stipulation in the record. This was done in the latter part of December, 1925. But before that, respondent made out a written notice as follows:

''Notice

To Receiver for Moorcroft Bank, Moorcroft, Wyo., and To Whom it May Concern:

Please take due notice that notes listed in assets of Moorcroft Bank receivership, totaling a balance of $2558.06

signed by Bert Waddel, Special a/c and numbered 7523, 7302 and 7317, and dated June 16, 1921, July 11, 1921 and July 12, 1921 respectively, are not personal obligations of Bert Waddell, but represent a trusteeship and so carried on the books of Moorcroft Bank by the notes themselves and the individual ledger sheets as such trusteeship for the necessary expense incurred by said Moorcroft Bank on a certain herd of cattle turned over by Wm. Oelkers on December 6, 1920, and one certain band of sheep taken over by said Moorcroft Bank from Noah Williams, and one certain band of sheep taken over by said Moorcroft Bank from Albert Andrews, and cared for by said bank during the years 1920 or 1921 or both respectively.

That all personal liability by said Bert Waddell is hereby disclaimed, formally.

Dated this 3rd day of December, A. D. 1925.

Bert Waddell.

Witness: I. M. Guthrie.''

And this notice, and the memorandum of February 5, 1921, were appended to the notes in suit when sold. The appellants are assignees of L. H. Robinson. A few additional facts will appear hereafter. The trial court rendered judgment for Waddell, the respondent.

1. Counsel for appellant argue that the evidence of the respondent and his witnesses, showing that the note was without consideration, was incompetent. That contention cannot be sustained. The testimony was offered to deny the legal existence of the contract and that it was never intended to be operative between the parties. In 22 C. J. 1213, it is said:

''The objection to parol evidence does not apply, where it is offered not for the purpose of contradicting or varying the effect of a written contract of admitted authority, but to disprove the legal existence or rebut the operation of the instrument, and in order to determine the validity of the writing, the true character of the transaction may always be shown. So also evidence which is offered not for the purpose of varying or contradicting the terms of a written instrument, but to show that it was never intended to be

operative between the parties and never in fact had any legal existence as a contract or grant is admissible.''

See to the same effect: 10 R. C. L. 1051-1053; Rice v. Rice, 101 Kans. 20, 165 Pac. 799; First Nat. Bank v. Stroup, 104 Kans. 11, 177 Pac. 836; Wilhoit v. Seavall, 121 Kans. 239, 246 Pac. 1013, 48 A. L. R. 1273; Webster v. Smith, 72 Vt. 12, 47 Atl. 101; 38 Harvard L. R. 240-241.

2. It is argued that the giving of the notes gave a false appearance to the assets of the bank; that to deny recovery on the notes would be equivalent to countenancing the fraud which the defendant perpetrated upon the creditors of the bank, the receiver and the purchaser of the notes from the latter. There are a number of cases, mostly collected by Brannon, Neg. Inst. (4th Ed.) 282, in which the courts have held that where a man gives a note for the purpose of bolstering up the assets of a bank, and to deceive the bank examiner of the state, and through him, the creditors of the bank, he will not be permitted, either on the grounds of public policy or on the ground of estoppel, to deny that the notes are valid. Where recovery has been upheld, that has generally been in cases where the bank became insolvent, and in Putnam v. Chase, 106 Or. 440, 212 Pac. 365, recovery was allowed even to a purchaser of the note from the receiver after maturity. When in such case, the bank has remained solvent, recovery has generally been disallowed, as in the case of First National Bank v. Felt, 100 Ia. 680, 69 N. W. 1057. But that has not always been the case, as, for instance, in Cedar State Bank v. Olsen, 116 Kans. 320, 226 Pac. 995, 997, where the court among other things said:

''The statute requires careful examination by the bank commissioner periodically in order that those who deal with banks may not be misled by appearances. To sanction any arrangement, whereby the real assets and securities of a bank are to be regarded as less than or different from the apparent assets and securities, would tend to defeat the

entire purpose of the regulatory statutes. Parties may not participate in a transaction, the object of which is to give to the assets of a bank a favorable appearance for purposes of examination, but less favorable for purposes of liability or enforcement.  *  *  *  It amounted to a fraud upon the depositors, stockholders, and the public to agree that the obligation which the defendant assumed was in fact not an obligation.  It amounted to a fraud upon the depositors, creditors and stockholders of the bank and a fraud upon the public because it gave assurance that the assets of the bank were sound.''

This is strong language, condemning severely every act by which a false appearance is given to the assets of a bank. But in that case the note sued on was given to take the place of notes representing excess loans, and for the purpose of making the banking department believe that it was to be an asset of the bank.  We have no such facts in the case at bar, nor are any of the cases cited by Brannon, supra, in point.

In the case at bar, the bank took over the cattle and the sheep as its property.  They had to be cared for, and kept over the winter.  Expenses had to be incurred.  The Omaha Bank, it is true, had a first lien on the cattle, but the Moorcroft bank had a second lien, and its officials, doubtless, were actuated to go to the expense stated because they thought that the equity in the cattle and the sheep warranted them in doing so.  Livestock depreciated during the subsequent period, and the expectations of the Moorcroft bank were not justified by the succeeding events, but with that we have nothing to do here.  The banking officials seem to have had some difficulty in determining how the expenses should be handled.  They apparently thought that some fund should be provided, against which to draw, and the account of which should in some way be balanced on the books.  They hit upon the expedient of having the respondent give notes with which to credit the expense account.  Had the notes not been given, there would have been an apparent overdraft, and overdrafts are the bane of banks.  Respondent

received nothing on the notes, and what he did was purely for the benefit of the bank. But by giving the notes, he lent a false appearance to the assets of the bank, and this cannot, under any circumstances, be commended. There was, however, no intentional fraud. The bank examiner, whose duties it is to make examinations of banks, from time to time in order to properly protect the creditors and others interested therein, was informed of what was done, and gave his approval, although we are surprised at that. The memorandum above mentioned stated the purpose of the notes. Any one interested in the bank could by examination have discovered the facts. There is nothing to show that any creditor or stockholder of the bank was in any way misled to his prejudice. The receiver and the purchasers from him took the notes with full knowledge of all the circumstances, and we cannot doubt that the latter's bid was made with that in view. Hence we can find nothing here upon which to predicate an estoppel. Nor are we justified, under these circumstances, to hold the respondent liable on the ground of public policy. Under ordinary circumstances a stranger to a transaction claimed to be fraudulent cannot take advantage of such fraud. 27 C. J. 5-7. Particularly would that be true, of course, where he has full and complete knowledge before parting with any value. And his assignees cannot be in any better position than he is. 5 C. J. 962-963. These are the principles, we think, that should be applied in the case at bar. The fact that the receiver listed the notes as assets cannot change that fact, for, in the first place, the respondent cannot be held responsible for what the receiver did, and in the second place the memoranda appended to the notes must have offset whatever erroneous impression the purchaser may have received from the inventory.

We think the court was clearly right, and that its judgment should be affirmed. It is so ordered.

*Affirmed.*

KIMBALL and RINER, JJ., concur.