OCHS et al. v. EQUITABLE LIFE ASSUR. SOC. OF THE UNITED STATES.

No. 11639.

Circuit Court of Appeals, Eighth Circuit.

April 22, 1940.

As Modified June 10, 1940.

Christy M. Farrar, of St. Louis, Mo. (Charles N. Welsch, Jr., of St. Louis, Mo., on the brief), for appellants.

Otis J. Garland, of St. Louis, Mo. (Theodore Rassieur and George M. Rassieur, both of St. Louis, Mo., on the brief), for appellee.

Before SANBORN, THOMAS, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

The plaintiff-appellant is trustee and liquidating agent of Love, Bryan & Co., Inc. The other plaintiffs are also trustees, being the surviving members of the last Board of Directors of said Love, Bryan & Co., Inc., a Missouri corporation which was incorporated in November, 1924, under the name of Love, Van Riper & Bryan, Inc., and was dissolved April 16, 1931. The defendant-appellee is a corporation organized under the laws of the State of New York as a life insurance company and duly licensed to do business in the State of Missouri.

In August, 1925, and prior thereto, Love, Bryan & Co., was a dealer in investment bonds and real estate mortgages in the City of St. Louis, Missouri. The Equitable Society desired a mortgage loan correspondent for the City of St. Louis and St. Louis County, and negotiations were had looking toward the appointment of Love, Bryan & Co. as such correspondent. An investigation was made by the Society concerning the financial responsibility, character and ability to carry on such a mortgage loan business by the appellant company prior to the establishment of the relationship. The negotiations finally culminated in what is designated and referred to as a written contract, dated August 15, 1925. As stated by the trial court it is unnecessary to set forth this lengthy printed instrument in full, and perhaps the findings made by that court, concerning its most pertinent provisions, are best incorporated here.

"This contract recited that Love, Bryan & Co. desired to submit to the Society for purchase notes secured by mortgages on real estate, and the Society was willing to examine the same with a view to purchase, and the contract therefore authorized Love, Bryan & Co. to submit mortgage loans on real property in St. Louis and St. Louis County, such mortgages to be valid first liens on the property described, title to be certified by an approved title examiner. The contract also provided that all loans be closed and all moneys advanced by Love, Bryan & Co. and the mortgage recorded before submitting the same to the Society for purchase and assignment to the Society; that on receipt of the original notes and mortgage, and other legal papers required, the Equitable Society agreed that upon its preliminary approval thereof to deposit to the credit of Love, Bryan & Co. in a New York bank the amount then owing and unpaid on the mortgage; that if the Society became dissatisfied with any mortgage purchased Love, Bryan & Co. agreed to repurchase such mortgage within one year for the amount then due thereon, such mortgage then to be assigned back to Love, Bryan & Co. unless the Equitable Society had finally approved of said mortgage in writing before the expiration of the year. Paragraph Eight of said contract provided that Love, Bryan & Co. would service all of the loans purchased by the Society; that is, see that the property was insured and the taxes paid in accordance with the mortgagor's covenants and attend to the collection and remittance of interest and principal, and if foreclosure became necessary to employ an attorney for that purpose, all of which services Love, Bryan & Co. 'agreed to do or cause to be done without cost to the Society' also to guarantee that the mortgages sold should be valid first liens and that the borrower had a valid and good title to the property and

to protect the Society and hold it harmless in the event of such defect in the title."

Paragraph eleventh provided as follows: "It is further agreed that in all transactions arising out of the performance of this agreement, the party of the first part" (i. e. Love, Bryan & Co.) "is acting and will act as agent of the borrowers in negotiating loans, and in no instance is to act or shall be authorized to act as agent of the Society, and that the commission charged the borrower for procuring the acceptance of any loan shall in no event exceed one percentum of the amount of the loan for each year for which the loan is made * * *".

Paragraph thirteenth provided as follows: "This agreement may be terminated, and cancelled at any time by either party hereto by mailing written notice thereof to the other party at its last known address, but such termination shall not release the parties hereto from any agreement entered into hereunder so far as the same shall affect loans purchased by the Society before such termination; and the party of the first part expressly agrees to continue to carry out and perform the duties and obligations set forth in paragraph Eighth of this agreement, if and so long as requested so to do by the Society until said loans are paid."

"By this contract of August 15, 1925 Love, Bryan & Co. was not obligated to sell any mortgage loans to the Equitable Society, nor was the Equitable Society obligated to purchase any mortgage loans from Love, Bryan & Co. and it is nowhere provided by said contract that the Equitable Society would pay Love, Bryan & Co. anything on account of any services in connection with mortgages purchased, nor was there any provision whereby Love, Bryan & Co. was permitted to retain any portion of the interest on any mortgage loans which might be sold to the Equitable Society."

While it is true that in this writing there is no express provision whereby Love, Bryan & Co. was permitted to retain any portion of the interest on any mortgage loans which might be sold to the Equitable Society, neither is there any provision to the contrary. And in paragraph eleven, in that so-called contract, there is found a recognition and acceptance of the well-known practice of dealers in real estate mortgages, when acting as correspondents.

of insurance companies in the purchase of such securities, to charge a commission to borrowers for procuring an acceptance of such loans. Furthermore an alternate practice is suggested by the Society itself in its letter of July 18, 1925, as follows: "Difference in Rates. As you know, there are two ways in which correspondents collect their commission; one is by charging a commission over the rate shown in the mortgage and the other way is by selling the mortgage at par, charging no commission, and deducting the correspondent's commission from the rate of interest—the latter method being known as a gross rate. If at any time you wish to show a gross rate in the mortgage, collect no commission, and take your remuneration out of the rate of interest, it can be done by endorsing on the face of the application the fact that the rate net to the Society will be less than the rate shown in the mortgage, and in that case a special form will be made out here and sent to you for your signature, which you can then return and it will be put with the rest of the papers in order to keep book-keeping straight. I merely give this to you for your information, in case you see fit to use this practice, but it is not permitted unless the application papers are properly endorsed as above stated."

Under the circumstances this direction cannot be said to be excluded from the written agreement made just a week later, under the familiar doctrine of merger. The letter opened with the following sentence: "I am writing you some instructions as to the class of loans that will be desired under our contract, and something of the method of procedure."

Furthermore, this commission method was actually put in practice in accordance with the suggestion of the Society which recognized it through several years of business transactions, involving a large number of mortgage loans.

The special form of agreement suggested by the Society's letter of July 18, 1925, supra, and designated "Agreement—Lower Rates", in substance, after describing the particular note and mortgage sold, and the interest according to the mortgage, and the rate of interest at which the particular mortgage was sold to the Society, (such difference usually being one-half percent, or the difference between 6% provided by the mortgage and 5½% interest yield to the Society) the parties agreed

that if the interest upon said note is collected by Love, Bryan & Co., Inc., it shall pay therefrom to the Society interest on said loan at the rate of 5½% upon the unpaid principal of said note, retaining from such interest the excess thereof for its own use and benefit; and in the event that interest is paid direct to the Society, that it (the Society) shall retain only such interest as may be due it under this agreement and pay over the balance thereof to Love, Bryan & Co.

The trial court found that "as money became more plentiful and competition for loans became keener the number of mortgage loans sold at lower interest rates increased and the number of these special lower rate agreements likewise increased". Referring to such lower rate agreements, the Society, in a letter to Love, Bryan & Co., dated May 1, 1928, said: "The number of these cases has grown to such an extent that we are eliminating individual lower rate agreements. We are enclosing a form in duplicate which we wish to have executed and returned by you and when received at this office, the Society will execute both copies and return one to you to be attached to your contract with us."

The "form in duplicate" to which reference is made is dated May 1, 1928, and reads as follows:

"Agreement made this First day of May, 1928 between Love, Bryan & Company, Inc. party of the first part and The Equitable Life Assurance Society of the United States, party of the second part, Witnesseth:

"Whereas, the parties hereto have entered into an agreement dated August 15, 1925, for the purchase of mortgage loans by the party of the second part from the party of the first part on dwellings in St. Louis, Missouri, secured by bonds or notes and mortgages or trust deeds, and,

"Whereas, it is understood and agreed that if any of said loans are sold to said party of the second part at a lower rate of interest than is provided for in the bonds or notes and mortgages or trust deeds securing the same said party of the first part shall have an interest therein for the difference between said rates.

"Now, Therefore, in consideration of the premises and of the sum of One Dollar by each to the other in hand paid, receipt whereof is hereby acknowledged, the parties hereto mutually covenant and agree that whenever said party of the first part shall sell to the said party of the second part any mortgage loan at a lower rate of interest than is provided for in the bond or note and mortgage or trust deed securing the same said party of the first part shall have an interest in said mortgage loan for the difference in said rates which shall be payable to said party of the first part as, if and when collected.

"It is understood and agreed, however, that the party of the second part shall have all the rights of sole and absolute ownership in said bonds or notes and mortgages or trust deeds including the right to release, extend or foreclose the same and that all rights of the party of the first part hereunder shall be subordinate in all respects to the rights of the party of the second part and that the party of the second part shall be liable only for an accounting to the party of the first part for money actually received in excess of the ownership of said party of the second part in said bonds or notes and mortgages or trust deeds.

"It Is Further Understood And Agreed that in case said contract between the parties hereto dated Aug. 15, 1925, is cancelled all the right, title and interest of the party of the first part hereunder in and to any mortgage loans purchased at a lower rate shall be terminated thereby.

"The rights of the party of the first part hereunder in any mortgage loan purchased by the party of the second part shall not be assignable.

"It is Further Understood And Agreed, that all loans heretofore purchased under said contract at a lower rate shall also be subject to the terms of this agreement and that no other lower rate agreement shall be necessary."

This agreement was signed in duplicate by both parties, that on behalf of Love, Bryan & Co. by its secretary, who was also the manager of its mortgage department. July 1, 1929, Love, Bryan & Co. became members of the New York Stock Exchange, as well as associate members of the New York Curb Exchange. It appears that the business and financial policy of the Equitable Society disapproved of membership by its correspondents in Stock Exchanges. Accordingly on November 18, 1929, the Society sent the following letter to Love, Bryan & Co.: "The Equitable Life Assurance Society of the United States hereby gives notice that the con-

tract dated August 15th, 1925, between Love, Van Riper & Bryan, Inc., now known by the name of.Love, Bryan & Co., Inc. and the said Society for the purchase and sale of mortgage loans in the city and county of St. Louis, State of Missouri, together with any and all amendments and modifications thereof, is hereby terminated and cancelled as provided in paragraph Thirteenth in said contract but such termination shall not release the said Love, Bryan & Co., Inc., from any agreements entered into under said contract or any amendment or modification thereof so far as the same shall affect any loan purchased by the Society under the terms of such contract and the said Society hereby requests the said Love, Bryan & Co. Inc. to continue to carry out and perform the duties and obligations set forth in paragraph Eighth of said agreement until further notice".

From the beginning Love, Bryan & Co. had serviced all of the loans sold and accepted by the Society as required by paragraph eighth of the August 15, 1925 agreement, and continued to render such service after November 18, 1929, until about April 30, 1930, when the Society notified the company that such service would no longer be required. During this latter period loans were sold to the Society at lower rates of interest, and the company, without objection from the Society, received the interest differentials on all such loans. In fact the parties continued their dealings substantially as before, except that no special lower rate agreements were executed after May 1, 1928. All of the interest differentials which had accrued prior to April 30, 1930, on account of interest paid on loans sold at lower interest rates have been received by or paid to Love, Bryan & Co.; but no interest participation by the company was allowed or paid by the Equitable Society after April 30, 1930.

Appellant, Ochs, as the duly appointed trustee and liquidating agent of Love, Bryan & Co., brought suit ultimately in three counts to recover from the appellee Society interest differentials or commissions due the company under transactions between the company and the Society, and collected by the Society from and after April 16, 1930. The amount claimed is $27,598.37. By consent of the parties the question of the effect or validity of the contract of May. 1, 1928, to cut off the

plaintiff-appellant's rights to the interest differentials claimed was tried as a separate issue and was submitted to the court for judgment. The trial court making findings of fact substantially as hereinabove set out concluded that the contract of May 1, 1928, is a valid contract, binding upon the parties thereto, and that all right to interest differentials terminated when the original contract of August 15, 1925, was cancelled. Judgment that plaintiffs have and recover nothing was entered accordingly.

On this appeal the points urged by appellants resolve themselves practically into the following:

1. Was the agreement of May 1, 1928, in effect authorized by and binding upon the plaintiff corporation?

2. Was the execution obtained by duress exercised by the defendant Society?

3. Did the Society waive the effect it claims for this agreement, and was it estopped to rely upon it?

4. Was that agreement supported by a valid consideration?

I. It is true that the agreement of May 1, 1928, was not formally authorized by the board of directors of Love, Bryan & Co. However, it was executed on behalf of that corporation by its secretary, Christopher, who was connected with the mortgage loan department of the company from the time it commenced business until its dissolution. During a considerable part of that time he was, the manager of that department and handled all the mortgage loan business of the company. He, generally, handled the correspondence with the Equitable, and was not required to submit such matters to the other directors and officers of his company. It is significant that the lower rate agreements, which formed binding contracts between the Society and the company, were regarded as routine matters and were not submitted to the board of directors. Many of them, and all of them after January 1, 1927, were signed by Christopher. It is evident from the entire record that knowledge of the agreement of May 1, 1928, must be imputed to Love, Bryan & Co. as a corporate entity. They knew that the Society was very strict about its investments, and had rigid rules for their protection. No one connected with the company at any time notified the Equitable that this agreement was repudiated by Love, Bryan & Co., who,

continued to operate under it for a period of approximately two years. The result must be, we think, that that corporation is bound by the terms of that agreement in so far as it has application to the transactions here involved.

■ II. We do not think the charge that the appellant-company's signature to the agreement of May 1, 1928, was obtained by duress exercised by the appellee Society merits serious consideration. In their brief counsel for appellants say: "We will concede that there is no strictly legal duress shown by the evidence". The mere fact that, in executing the agreement of May 1, 1928, appellants may have been actuated by desire to insure the continuance of a profitable business relationship cannot amount legally to an implied element of compulsion.

■ III. Nor do we think that participation in the practice respecting interest differentials, and the allowance of such commissions to appellant between the dates of May 1, 1928, and April 16, 1930, amounts to a waiver by the Society of the effect it claims for the agreement of May 1, 1928, and to estoppel to rely upon its legally applicable terms. The decision of this controversy must depend upon the extent to which that agreement was supported by a valid consideration.

■ IV. Some confusion has arisen with respect to the consideration status of the two basic agreements—that of August 15, 1925, and that of May 1, 1928. Standing alone, each was executory merely and binding upon neither party thereto until performance intervened. The agreement of August 15, 1925, was really an offer to purchase mortgage loans or bonds when submitted to it by its St. Louis correspondent, and a definition of the terms and conditions upon which such loans and bonds would be accepted. So far as the binding effect of this agreement was concerned, the Society was under no obligation to purchase, nor was the correspondent bound to submit. When a submission and purchase had been completely consummated in accordance with the terms prescribed in the executory agreement of August 15, 1925, there was present such performance as imported a valid consideration to both contracting parties. These terms were read into each mortgage loan purchase; and, as a reading of the basic agreement will disclose, each such consummated purchase constituted a separate and distinct transaction of performance under that agreement.

Section eleven of the agreement of August 15, 1925, expressly recognizes the commission charged the borrower to be the element of profit accruing to Love, Bryan & Co. as the St. Louis correspondent of the Society. The Society letter of July 18, 1925, suggested the practice of deducting the correspondent's commission from the gross rate of the mortgage sold at par. The Society, as heretofore stated, provided the form upon which that procedure was conducted in each individual case; and that practice was used by common consent for a period of years,—until the agreement of May 1, 1928, was executed. Paragraph thirteenth of the original agreement, which provided that that agreement might be terminated and cancelled at any time by either party thereto, provided further that "such termination shall not release the parties hereto from any agreements entered into hereunder so far as the same shall affect loans purchased by the Society before such termination". And section fifteenth of this agreement of August 15, 1925, further provides that: "In all amortized loans which have not been in force for five years if no commission has been charged the borrower, the interest of the party of the first part (Love, Bryan & Co.) shall continue until the end of the fifth year and shall then cease but the Society shall have the right, if it shall so elect, to collect all payments due on said loans and pay over to the party of the first part such sums as may be due it as and when collected".

The amendment of May 1, 1928, which was a modification of the agreement of August 15, 1925, provided that, in case the said agreement should be cancelled, all the right, title and interest of Love, Bryan & Co. in and to any mortgage loans purchased at a lower rate should be terminated by such cancellation. A later paragraph in this same amendment purported to make this provision: "It Is Further Understood and Agreed that all loans heretofore purchased under said contract at a lower rate shall also be subject to the terms of this agreement and that no other lower rate agreement shall be necessary."

■ If this paragraph undertakes to terminate the interest of Love, Bryan & Co. in and to any mortgage loans purchased at a lower rate, prior to May 1, 1928, in which the rights of the parties

had been fixed by special agreement, executed in the form prescribed by the Society itself, it is void for want of adequate consideration. As said by Mr. Williston in his Work on Contracts (Vol. 1. Rev.Ed. Sec. 130 p. 443), "performance or the promise to perform any obligation previously existing under a contract with the promisee is not a sufficient consideration" to support another contract. The amendment of May 1, 1928, was merely a modification of the agreement of August 15, 1925, and contained an additional condition to the acceptance of loans by the Society. It applied to future business and could have no effect upon past transactions in which the rights of the parties had been finally and legally determined. Counsel for appellee have sought to import a consideration in the receipt of benefits by Love, Bryan & Co. from the operation of the relationship after May 1, 1928. They concede that "the contract recited merely a nominal consideration". But, obviously, the agreement of May 1, 1928, was not instrumental in adding benefits for services to Love, Bryan & Co. as correspondent of the Society in the submission of mortgage loans.

As has been said, the agreement of May 1, 1928, merely adds a condition upon which the Society would thereafter accept mortgage loans upon submission by appellant. It became to that extent merely an integral part of the agreement of August 15, 1925. Its language in that respect was plain. We think both parties were bound by the terms of these agreements with respect to all loans purchased after May 1, 1928.

It follows that because of the inclusion within the terms of the decree of all interest differentials accruing to appellant from transactions consummated prior to May 1, 1928, the cause must be reversed and remanded for an accounting in conformity with the views herein expressed. It is so ordered.

SANBORN, Circuit Judge (concurring).

I concur in the conclusion expressed by Judge VAN VALKENBURGH. I think that the agreement of May 1, 1928, was not sufficiently definite or explicit to disclose that the minds of the parties met upon the proposition that in case of cancellation of the contract of August 15, 1925, Love, Bryan & Co., Inc., was to forfeit to the Society the earnings of the company represented by uncollected interest differentials on loans sold by the company to the Society prior to May 1, 1928, and covered by special lower rate agreements. Since the Society drafted the agreement of May 1, 1928, and since forfeitures are not favored in the law, the general language of the last paragraph of the agreement of May 1, 1928, I think, is not reasonably susceptible of the construction now contended for by the Society. I regard it as providing that loans (if any) theretofore purchased by the Society at lesser rates of interest than those specified in the loans and not covered by lower rate agreements should be governed by the contract of May 1, 1928, and not as indicating any intention on the part of the company to transfer to the Society, in case of cancellation of the agreement of August 15, 1925, the uncollected earnings to which the company was clearly entitled under the lower rate agreements entered into prior to May 1, 1928.