## PET MILK CO. v. BOLAND.
### No. 13815.

United States Court of Appeals
Eighth Circuit.
May 24, 1949.

Rehearing Denied June 17, 1949.

RIDDICK, Circuit Judge, dissenting.

Roland F. O'Bryen, St. Louis, Mo. (Fred L. Williams, Robert F. Schlafly and Charles S. Baumgarten, St. Louis, Mo., were with him on the brief), for appellant.

Roberts P. Elam, St. Louis, Mo. (John S. Leahy, St. Louis, Mo., and Joseph L. Badaracco, University City, Mo., were with him on the brief), for appellee.

Before GARDNER, Chief Judge, and RIDDICK and COLLET, Circuit Judges.

COLLET, Circuit Judge.

This action is to recover on quantum meruit for a balance alleged to be due appellee [plaintiff] for the construction of a sewer line for appellant [defendant] at the latter's Siloam Springs, Arkansas, plant. The controversy in the trial court and about which this appeal is concerned revolves around the question of whether a certain written "Purchase Order" submitted to plaintiff and signed by his representative, his son, represented the agreement between the parties or whether an oral agreement, varying in one important respect from the written purchase order, constituted the contract. There was a jury verdict for the plaintiff for $30,023.78 and interest for which judgment was given. After unsuccessful motions for judgment for defendant notwithstanding the verdict or for a new trial, this appeal followed. Generalizing the defendant's contentions, it asserts that (a) the written purchase order constituted the contract between the parties and that parol evidence of conversations and understandings had prior to and contemporaneously with its execution, which were admitted as evidence, violated the parol evidence rule, (b) that the parol agreement asserted by plaintiff constituted a modification of the alleged written contract for which modification there was no consideration, and (c) that the court's charge was erroneous. The facts necessary to an understanding of these issues follow.

Plaintiff, a contractor, was engaged in the performance of another contract for defendant at Siloam Springs, Arkansas, in the fall and winter of 1943. Early in January, 1944, defendant's construction superintendent at Siloam Springs suggested to plaintiff that he bid on the construction of a fifteen-inch sewer line which was to constitute a part of defendant's Siloam Springs plant. Under date of January 18, 1944,

plaintiff submitted a written proposal to defendant to construct the sewer line and a water line. In that proposal plaintiff offered to perform the necessary earth trench excavation at $1.75 per cu. yard and the rock excavation at $20 per cu. yard. The above-mentioned invitation and proposal led to further negotiations in which defendant's construction superintendent furnished plaintiff's son with a profile of the sewer project. Plaintiff made a further written proposal, dated February 16, 1944, in which he offered to perform the earth excavation, characterized as "machine excavation," at $2.25 per cu. yard and the rock excavation, designated as "excavation, blasted," at $15 per cu. yard. The estimated yardage of earth excavation was stated in the February 16 proposal. No estimate of the amount of rock excavation was given. At that time the approximate amount of rock to be encountered was unknown by either party. These proposals naturally included other details incident to a construction project of that nature, but since the present controversy involves only these items, brevity suggests the exclusion of the non-controverted items from present consideration. On February 16, 1944, plaintiff's son (who at all times represented plaintiff) met defendant's purchasing agent and engineer at defendant's office in St. Louis. Plaintiff's evidence is that at the February 16 meeting defendant's purchasing agent was contending that the trench need not be more than 24 inches in width, while plaintiff's son was insisting that it should be wider because 24 inches was too narrow for safety and that the machine with which the work was to be done cut a trench 42 inches in width. His evidence was to the effect that a compromise was reached on a 33-inch trench, but with no specific agreement as to the method of calculating the necessary amount of earth to be removed

and compensated for in the construction of a trench of that width and the depth required (at some places as deep as sixteen feet). Because of the urgency of the need for the sewer by defendant, it was agreed that plaintiff would commence work immediately and the details of the contract be worked out later. It was also agreed that the work could and would be completed within 45 days or by April 15, 1944. Plaintiff did commence the work on February 22, 1944. Shortly thereafter defendant mailed to plaintiff a written purchase order in which the proposed unit prices, as submitted by plaintiff, were fixed at $2.25 per cu. yard for machine excavation and $15 per cu. yard for blasted excavation. With respect to the method of computing the amount of material excavated for which compensation should be made, the purchase order provided that:

"The cubic yards of all excavation for the 15-inch tile sewer line is to be figured on the basis of a trench 33 inches wide multiplied by the average depth and by the length of the trench through the cut."

It is clear from all the evidence that such a method of calculating the yardage removed, referred to as the "pay line width" method, contemplated the assumption of an arbitrary width of 33 inches regardless of whether the actual width of the trench was more narrow or wider than 33 inches. Plaintiff objected to that method of computation, and on March 10 and 11, 1944, wrote defendant two letters, the substance of which was that the assumption of a trench 33 inches in width for all "earth excavated trenches" was satisfactory, but that the amount of excavation to be compensated for should be the amount necessarily excavated in the construction of the trench, to be "determined from the final profile by a cross sectioning method."[1] On April 5, 1944, plaintiff wrote

---

[1] From letter to Pet Milk Co. from John V. Boland Construction Co., March 10, 1944:

"Reference to paragraph marked #3: 'All trench excavation shall be 33" wide while all pier excavation shall be 33 x 54" x 33" deep, and the cubic yardage determined from the final profile by a cross sectioning method.'"

Letter to Pet Milk Co. from John V. Boland Construction Co., March 11, 1944: "Gentlemen:

"Referring to our letter of March 10, with particular reference to paragraph three, the wording should read that all earth excavated trenches shall be 33 inches wide.

"Yours very truly,

"John V. Boland Construction Co."

defendant stating that unexpected blasting of rock had been found necessary and requested that 80 cents per cubic yard be considered as compensation for the cost of the removal and replacement of the additional earth excavation made necessary by the blasting of a "V" shaped trench.[2] Two other objections to the purchase order were made in the March 10 letter which are not now material. Thereafter defendant sent plaintiff another purchase order, dated February 18, 1944, in which the two corrections last above noted were made, but retaining the pay line width clause with an inconsequential change of words.[3] The work continued, and about the middle of April defendant's construction superintendent asked plaintiff's son why the purchase orders had not been signed. He was informed that plaintiff's letters of March 10 and 11 and April 5 had not been answered, and since the conditions were different than anticipated, plaintiff was reluctant to sign the purchase orders as written. The construction superintendent suggested that plaintiff's son call defendant's St. Louis office concerning its failure to answer the letters. That was done, and at defendant's purchasing agent's request plaintiff's son went to St. Louis on April 26 and saw Mr. Schwendener, the purchasing agent. Plaintiff's evidence is that at that conference plaintiff's son stated that plaintiff would like to be paid for the work done and wanted an understanding so that they could be paid; that he and Mr. Schwendener agreed upon the unit prices stated in the purchase order; that they agreed that the pay line width of 33 inches should apply to earth excavation; that he refused to sign the purchase order unless the conditions stated in the letters of March 10 and 11 and April 5 applied to rock excavation; that he was then assured by Mr. Schwendener that since the time fixed in the purchase order for the completion of the work had already expired (it was dated February 18, 1944, and called for completion within 45 days or not later than April 15, 1944), if it was signed it would serve only as a notation of the unit prices to be paid and that plaintiff could then send in estimates of quantities in accordance with those unit prices and be paid; that Mr. Schwendener said that the signing of the purchase order was necessary in order that the payments could go through defendant's regular routine. Plaintiff's son testified that it was with those understandings he signed the purchase order on April 26, 1944. The purchase order contained a clause that it was understood and agreed that "the acceptance of this order shall constitute a contract between Pet Milk Company, Owners, and the John V. Boland Construction Co., Contractor, of St. Louis, Missouri, for the faithful performance and completion of this work to our satisfaction". It did not contain any provision relative to the time or method of payment.

An estimate of work done was submitted April 30, 1944, and another on May 31, 1944. These estimates contained, among others which are not in dispute, items for earth excavated trenches computed by the

---

[2] Letter to Pet Milk Co. from John V. Boland Construction Co., April 5, 1944:

"Attention: Mr. Schwendener.
"Dear Sir:
"Subject: Sewer Construction
"Siloam Springs, Arkansas.
"Since starting this job we have encountered conditions contrary to those talked over at the time of bidding.
"This job was bid as a normal excavation job, but due to blasting it has become necessary to excavate a "V" shape ditch instead of shoring as [contemplated], of which we are now preparing cross sections.
"This condition necessitates the removal and replacing of three to four times the amount of yardage of wet excavation in order to reach the Sewer Grade. This is due to subterranean springs which are opened up with each blast of rock encountered.

"We feel justified in asking you to consider the matter of 80¢ per cubic yard for this additional earth excavation which will about cover the cost of removing and replacing this surplus earth.

"We thank you for your consideration of same, we are

"Very truly yours,
"John V. Boland Construction Co."

[3] From purchase order, dated February 18, 1944:

"The cubic yards of excavation for the 15" tile sewer line is to be figured on the basis of a trench being 33" wide multiplied by the average depth and by the length of the trench through the cut."

pay line width method. They also included an item for rock blasting excavation in which the actual amount of rock from the "V" shaped trench, calculated by the cross-section method, was charged for. Also included in these estimates was an item representing the actual amount of earth removed in performing the rock excavation at 80 cents per cu. yard. These estimates were not paid. The work progressed until after several inquiries by plaintiff as to the reason for non-payment with no response, an inspection of the job by defendant's engineer, and a threat by plaintiff that if payment was not made he would stop the work, defendant's engineer who made the inspection wrote plaintiff under date of June 23, 1944, to the effect that since the amount of rock and earth charged for in the blasted rock excavation work was not calculated on the pay line width method provided for in the purchase order, payment would not be approved. The letter also contained the following:

"In our discussion on the 22nd you intimated that unless agreement was reached at once, you would discontinue work on the job. We feel it only fair therefore to put you on notice at this time, that in the event of such action on your part, we would immediately arrange for completion of the job by other contractors, and hold you strictly accountable for the additional cost, if any, and the damages for delay incurred ensuing from your refusal to perform under our contract with you.

"Please do not lose sight of the fact that the original contract called for completion within 45 days after Feb. 22, 1944. Completion of the job has already been long delayed, and has resulted in great inconvenience to the company, and considerable censure from the local inhabitants. Furthermore, the beginning of operations in the plant were delayed, and have been hampered, since actual operation started as a result of the failure to complete the contract in accordance with its terms."

Upon receipt of that letter plaintiff's evidence was that he stopped the work, discharged his workmen, and notified defendant's construction superintendent thereof; that the following day the construction superintendent advised plaintiff that he had been instructed to request him to complete the work and that payment would be made at the unit prices set out in the purchase order and for the quantity of material excavated, computed as plaintiff computed those quantities in his estimates; that plaintiff thereupon called his workmen back, resumed the work after an interruption of two days, and continued until its completion satisfactory to defendant on August 10, 1944. Two lump sum payments were made on account in July and August, totaling $25,000. These payments were not allocated to any specific items in the estimates above mentioned or a later estimate (in the same form), submitted June 30, 1944. The fourth and final estimate was submitted (also in the same form) September 1, 1944. The foregoing outline of the evidence from plaintiff's viewpoint will suffice to indicate plaintiff's theory of the case as disclosed by his evidence.

The defendant's theory of the case, which its evidence tended to support, was, simply and tersely stated, that at the April 26 conference plaintiff's son and Mr. Schwendener agreed upon the terms of the contract, including the method of computing the rock excavation, and that the agreement reached was the agreement evidenced by the written purchase order signed that day. Defendant's evidence contradicted that of plaintiff's with respect to whether the terms and conditions of plaintiff's letters of March 10 and 11 and April 5 constituted a part of the agreement reached, and also contradicted plaintiff's evidence that defendant's construction superintendent had assured plaintiff that rock excavation would be paid for upon the method of computation claimed by plaintiff. The superintendent testified that he told plaintiff he would be paid in accordance with the provisions of the purchase order.

In plaintiff's complaint he alleged that the purchase order was signed by plaintiff's son at defendant's request upon the assurance that any adjustments with reference to the disputed question of computing the amounts due for excavation could be determined upon completion of the work. When defendant pleaded the purchase order in its answer as the agreement between the

parties, plaintiff replied that it was invalid as a contract because it was impossible of performance within the time it fixed, and because it was induced and secured by defendant by fraudulent representations in that defendant represented that a signed purchase order was necessary for defendant to make any payments for work done and that if plaintiff would sign the purchase order he would be paid for the work done in accordance with the method followed in plaintiff's estimates upon the unit prices provided in the purchase order.

From the pleadings and the evidence the position of the parties is reasonably clear. Plaintiff contended that the purchase order was not the contract; that it was agreed at the April 26 conference that the unit prices should be as set out in the purchase order; that the pay line width should apply to machine (earth) excavation; that the method of computing rock excavation would be calculated as stated in the March 10 and 11 letters by the cross-section method; that the extra earth excavation and replacement necessitated by the blasting should be compensated for as requested in the April 5 letter at 80 cents per cu. yard; and that thereafter a dispute arose as to the applicability of the purchase order pay line width provision to blasted rock excavation and it was agreed that if plaintiff would finish the job defendant would pay for the blasted rock excavation and the additional earth excavation and replacement made necessary by the rock excavation in accordance with the letters of March 10 and 11 and April 5 and the manner of computing those quantities in plaintiff's estimates. Defendant contended that the purchase order constituted the contract.

█ If the written purchase order did evidence the agreement between the parties, evidence of prior or contemporaneous negotiations and understandings contradictory to its unambiguous terms (and plaintiff does not contend that its terms are ambiguous) was not admissible.

New Amsterdam Casualty Co. v. United States Shipping Board, 4 Cir.; 16 F.2d 847; Crim v. Crim, 162 Mo. 544, 63 S.W. 489, 54 L.R.A. 502, 85 Am.St.Rep. 521; Supreme Lodge, K. P. v. Dalzell, 205 Mo.App. 207, 223 S.W. 786; Fischman-Harris Realty Co.

v. Kleine, Mo.App., 82 S.W.2d 605; England v. Houser, 178 Mo.App., 70, 163 S.W. 890. If the purchase order was the contract, under the foregoing authorities plaintiff may not vary its terms by parol evidence. But in order for the foregoing rule to apply it must first be established or conceded that the purchase order was the contract. In the case of In re Hicks & Son, 2 Cir., 82 F.2d 277, 279, Judge Learned Hand, speaking for that Court, said:

"It is well settled that whatever the formal documentary evidence, the parties to a legal transaction may always show that they understood a purported contract not to bind them; it may, for example, be a joke, or a disguise to deceive others. (Citing cases.) It is no objection that such an understanding contradicts the writing; a writing is conclusive only so far as the parties intend it to be the authoritative memorial of the transaction. Whatever the presumptions, their actual understanding may always be shown except in so far as expressly or implicitly they have agreed that the writing alone shall control."

█ The general rule is stated in 32 C. J.S., Evidence, § 972, as follows:

"The objection to parol evidence does not apply where it is offered not for the purpose of contradicting or varying the effect of a written contract of admitted authority, but to disprove the legal existence or rebut the operation of the instrument, and in order to determine the validity of the writing the true character of the transaction may always be shown. So also evidence which is offered not for the purpose of varying or contradicting the terms of a written instrument but to show that it was never intended to be operative between the parties and never in fact had any legal existence as a contract or grant is admissible."

The rule is the same in Missouri where this contract appears to have been made. In Barrett v. Davis, 104 Mo. 549, 16 S.W. 377, loc. cit. 379, the Supreme Court of Missouri said:

"Facts going to show that a writing never acquired original vitality as a contract are not considered as infringing the rule of evidence excluding verbal contradiction of

writings. Tracy v. [Union] Iron-Works Co., [104 Mo. 193], 16 S.W. 203."

In McElvain v. St. Louis & S. F. R. Co., 151 Mo.App. 126, 131 S.W. 736, 746, the Court held:

"For the purpose of showing that the plaintiff did not assent or agree to the terms of the contract, extrinsic evidence is admissible, not to contradict its express terms, but to show whether it was fairly and honestly entered into."

The same rule is asserted in the later cases of Thompson v. Baltimore & Ohio R. Co., D.C.Mo., 59 F.Supp. 21, 40; Vardeman v. Bruns, Mo.App., 199 S.W. 710, and Elmer v. Flett, Mo.App., 297 S.W. 985, 988. In the latter case the Court said:

"The law is well settled that a writing in the form of a contract may be shown never to have become operative as a contract." Citing Vardeman v. Bruns, supra, and Poplin v. Brown, 200 Mo.App. 255, 205 S.W. 411.

And if it be said that the contract is controlled by the law of Arkansas, the same rule is recognized there. Marshall Motor Service v. Norm Co., 194 Ark. 805, 109 S. W.2d 662; National Cash Register Co. v. Holt, 193 Ark. 617, 101 S.W.2d 441; Massachusetts Mutual Life Ins. Co. v. Brun, 187 Ark. 790, 62 S.W.2d 961. It has been generally recognized. McCormick Harvesting Mach. Co. v. Faulkner, 7 S.D. 363, 64 N.W. 163, 58 Am.St.Rep. 839; City National Bank v. Dwyer, 47 S.D. 567, 200 N. W. 109; McJunkin v. Richfield Oil Corp., D.C., 33 F.Supp. 466; Texas Co. v. Berry Garage, 121 Cal.App. 455, 9 P.2d 241; P. A. Smith Co. v. Muller, 201 Cal. 219, 256 P. 411; Choolgian v. Nordstrom, 111 Conn. 572, 150 A. 499; Gardner v. Gardner, 45 R.I. 214, 121 A. 385; State Savings & Loan Co. v. Strong, 226 Ala. 453, 147 So. 436; La Cava v. Breedlove, 77 Cal.App.2d 129, 174 P.2d 880; Greeley v. Greeley, 119 Me. 264, 110 A. 637; Massachusetts Biographical Soc. v. Howard, 234 Mass. 483, 125 N. E. 605; Martin v. Clem, 138 Okl. 245, 280 P. 826; J. M. Radford Grocery Co. v. Noyes, Tex.Civ.App., 233 S.W. 117; Whitcher v. Waddell, 42 Wyo. 274, 292 P. 1091; Haugens v. Foster, 320 Ill.App. 212, 50 N.E. 2d 524; Cumnock-Reed Co. v. Lewis, 278 Ky. 496, 128 S.W.2d 926; Ware v. Allen, 128 U.S. 590, 9 S.Ct. 174, 32 L.Ed. 563.

The only real issue in the case was whether the purchase order was "accepted" —to use its language—as the contract between the parties. The trial court properly admitted parol evidence on that issue. And if it did not represent a meeting of the minds of the parties, all that transpired relative to the agreement between the parties was clearly admissible to establish what the agreement actually was. Upon plaintiff's theory of the case the parol evidence, about the admission of which defendant complains, was competent upon the issue that the purchase order did not constitute the contract and to show what the contract actually was.

Defendant's contentions that an oral modification of a written contract must be supported by adequate consideration to be binding and that the evidence did not show such consideration are germane to the instructions and will be considered in connection therewith. Its further contention that there can be no recovery on the basis of an oral modification of a written contract when such oral contract has not been distinctly pleaded has been waived.

The jury were instructed concerning the respective contentions of plaintiff and defendant. It was instructed that plaintiff contended that the purchase order was signed with the understanding that it was essential under defendant's method of doing business for payment to be made by defendant and that if it was signed by plaintiff, when the sewer line was completed plaintiff would be paid upon the unit prices provided in the purchase order and in accordance with plaintiff's estimates of the work completed, and that it was in reliance on those representations that plaintiff signed the purchase order. The jury were then instructed that it was defendant's contention that defendant was only required to pay plaintiff for excavation computed upon the basis of a trench 33 inches wide because the purchase order so provided and the purchase order was freely and voluntarily executed without any representations as claimed by plaintiff and was therefore

binding on plaintiff. It was then instructed that plaintiff and defendant had entered into a contract on April 26, 1944 (the purchase order), under the terms of which contract plaintiff could not recover more than $6,929.39 (the amount defendant conceded was due plaintiff under the pay line width clause of the purchase order and which amount defendant had formally tendered).[4] The jury was instructed that the extension of time for the performance of this contract was by mutual agreement and did not in any way affect any of the other terms of the contract. It was instructed that the hazards of performance of a contract such as the "one signed on April 26, 1944," were assumed by the contractor when he entered into the contract and that plaintiff could not recover for increased cost as extra work on discovering that he made a mistake in his estimate of the cost or that the work was more difficult and expensive than he anticipated. It was instructed without qualification that "all promises, discussions, and correspondence between the parties before the 26th of April, 1944, were merged in the written contract of that date and are not to be considered in any way in determining the terms or provisions of the contract signed on April 26th, 1944." The jury was told that if plaintiff did not receive any payment for his work prior to July, 1944, "said fact in and of itself did not constitute a breach by defendant of the contract of April 26, 1944, because said contract did not fix the time for making payment prior to the completion of the work called for by the contract." The jury was further instructed that "despite the contract between plaintiff and defendant entered into on the 26th of April, 1944", if it found (1) that payment was withheld until after June 29, 1944, (2) that no explanation was made of the failure to make such payments until June 23, 1944, (3) that defendant asserted a claim against plaintiff for failure to perform the contract of April 26, 1944, by April 15, 1944, (4) that a bona fide dispute as to method of payment computations existed, (5) that plaintiff had abandoned the work, (6) that defendant's agent had been authorized to and did make a new agreement in June, 1944, and (7) that plaintiff resumed work in reliance upon the new promise, plaintiff must recover the "reasonable value" of his service.

There is an irreconcilable conflict and inconsistency in these instructions and they do not present to the jury for determination the issues made by the evidence and the pleadings. The jury should have been instructed that it should find whether the purchase order was agreed to on April 26, 1944, as the contract between the parties. It should have been instructed that if that question was answered in the affirmative, plaintiff was bound by it and could not recover more than the amount tendered, for there was no ambiguity in the terms of the pay line width provision of the purchase order. The plaintiff frankly concedes that and properly says that the question was whether that provision was intended to be applicable to rock excavation—another way of saying that the purchase order was not the contract. Instead of submitting that question, the instruction tells the jury that the purchase order was the contract but could be avoided if certain facts were found. None of those facts would justify the avoidance of the purchase order if it was the contract. (1) The purchase order did not fix the time of payment, hence failure to make payment thereunder prior to completion of the work was not a violation of its terms and did not justify its rescission, as the court in another instruction pointed out. Only in the event plaintiff's theory was correct that the purchase order was not the contract, and that another and different agreement including a promise to pay on periodical estimates actually was the contract which was made on April 26, 1944, could there have been an obligation

---

[4] From the Record, p. 312:

The Court instructs the jury that on the 26th of April, 1944, plaintiff and defendant entered into a contract in the City of St. Louis, State of Missouri, for the construction of a water supply line and relief sewer, at the plant of the defendant at Siloam Springs, Arkansas, which construction work was then and there in progress; that under the terms and provisions of the contract aforementioned the plaintiff may not recover any sum in excess of $6929.39 and interest from the date of demand to October 27th, 1944, at the rate of six per cent per annum."

to pay sooner than completion. (2) If the purchase order was the contract, there was no obligation thereunder for defendant to explain its failure to make payments prior to June 23, 1944. Only in the event the parol agreement supplemented by the letters of March 10 and 11 and April 5, 1944, was the contract, as contended for by the plaintiff, could there have been any necessity for an explanation of defendant's failure to pay anything on the contract prior to June 23, 1944, or prior to completion of the work. (3) The only evidence of an assertion of a claim by defendant against plaintiff "for failure to perform the contract of April 26, 1944, by April 15, 1944, was the letter of June 23, 1944, the pertinent portions of which have been quoted above. That letter did not constitute such a claim in violation of the terms of the purchase order, or in violation of an implied waiver of the date of completion, as would justify, a rescission of the purchase order as a contract. (4) There could have been no bona fide dispute as to the method of computing payments under the purchase order. The pay line width provision was perfectly clear and unambiguous, which, as heretofore noted, plaintiff concedes. The dispute concerned the question of whether the purchase order constituted the contract with reference to blasted excavation, which question was not submitted to the jury at all. (5) (6) (7) If the purchase order was the contract, as the court had instructed the jury, plaintiff would have had no right to abandon the work for any of the reasons hypothesized in the instructions and his abandonment and subsequent return thereto would furnish no consideration for a new promise by defendant's agents. The instruction therefore instructed the jury that the purchase order was the contract, but directed them to disregard it upon a combination of improper factual premises.

█ Plaintiff contends that the error of the trial court in instructing the jury that the purchase order constituted the contract between the parties was favorable to the defendant and should not warrant a reversal. In view of the length of time this cause has been pending it would be desirable to reach that result. And if that error could be segregated from the remainder of the charge, leaving the remainder in such form that it submitted the real issues, plaintiff's contention would warrant more serious consideration. But this erroneous premise ignored, and in fact withdrew from consideration, the primary issue, i.e., whether the purchase order really evidenced the agreement. It was such an integral part of the remainder of the charge that its segregation therefrom left the jury without any direction on any proper theory. Under those circumstances, we cannot surmise what the jury might have done had they been properly instructed.

The conceded error in the instructions relative to the measure of the recovery need not be considered. The jury took care of that by their verdict, and it is improbable that the error will be repeated.

For the reasons noted the cause is reversed and remanded for a new trial.

█ In the printing of the record much redundant and immaterial matter has been included. The record consists of 342 pages, exclusive of index, and seems to have been prepared on the theory that the cause was to be tried de novo in this court. This, however, is an appellate court where litigants may present for our consideration alleged errors committed by the trial court, and Rule 10(a) of this court, among other things, provides that, "The appellant or petitioner shall serve and file with his brief a separate printed record carefully indexed which shall contain a clear, *concise and condensed statement* of so much of the entire record on appeal for review as may be essential * * * to enable the court to decide the questions presented for review." Subdivision (b) of the same rule contains provision that, "The printed record shall also contain so much of the evidence, either in narrative or question and answer form, as may be *necessary* to enable this court to determine the questions presented for decision."

Even a cursory examination of the printed record discloses that it contains a veritable avalanche of redundant and immaterial matter. For example: (1) The entire testimony in question and answer form has

been reproduced without condensation and contains pages of immaterial conversation between court and counsel and between opposing counsel. (2) Although no question is raised as to the jurisdiction of the court, nor the regularity of the removal proceedings, there is set out the entire removal proceedings comprising some eight printed pages. (3) Defendant interposed a motion in the trial court for an order requiring plaintiff to produce certain documents and books. Although no question is raised as to the ruling of the court on this motion, the proceedings are set out in full, comprising some five printed pages. (4) There is one important exhibit in the case referred to as the Purchase Order. Three photostatic copies of this appear in the Record and comprise between five and six pages. The only other exhibits of any importance are certain letters sent by appellant to appellee prior to the signing of the purchase order. They are all reproduced in full as a part of plaintiff's case. Then there appears a large number of exhibits, many of which are folded pages, comprising twenty-three pages, appearing at pages 179 to 202, both inclusive. Other exhibits appearing in the record from pages 279 to 291, both inclusive, and from pages 295 to 305, both inclusive, seem to be wholly immaterial to any issue presented.

This is such a flagrant disregard of our rules that we feel it ought not to go unnoticed. It would be manifestly unjust to assess the cost of the printing of such unnecessary matter to the losing litigant. Newton v. Consolidated Gas Company, 258 U.S. 165, 42 S.Ct. 264, 66 L.Ed. 538. The Clerk of this court will in taxing the costs disallow the cost of printing all such immaterial matter.

RIDDICK, Circuit Judge (dissenting).

The record on this appeal, stripped of nonessentials, presents the following case.

On April 26, 1944, the appellant as owner and the appellee as contractor met for the specific purpose of reducing to writing an agreement between them for the construction by appellee of a sewer line and a water line to serve one of appellant's manufacturing plants. The parties had agreed upon the unit prices to be paid appellee for the excavation necessary in the work to be done. They had not agreed upon the method of computation of quantities of earth and rock excavated for which appellee was to be paid the unit prices a cubic yard agreed upon. At the time of this meeting appellee was fully advised concerning the difficulties to be encountered in the excavation work. He knew that he would be required to excavate quantities of both earth and rock in excess of the quantities for which he would receive payment if the method of computation insisted upon by appellant was accepted by him. Nevertheless, he accepted the terms offered by appellant and signed a written contract which plainly expressed the method of computation of the quantities of earth and rock excavated in the work and payable at the unit prices agreed upon.

Appellee can not now be heard to say that the written contract for the performance of the work, signed by him and by the appellant on April 26, 1944, was not intended to be binding upon either of them, nor may he be permitted to vary the terms of the contract fixing the method of computation of quantities of earth and rock excavated by proof of prior or contemporaneous oral agreements between the parties. The trial court was correct in so instructing the jury. New Amsterdam Casualty Co. v. United States Shipping Board, etc., 4 Cir., 16 F.2d 847, 849, 850; Crim v. Crim, 162 Mo. 544, 63 S.W. 489, 491, 54 L.R.A. 502, 85 Am.St.Rep. 521; Supreme Lodge K. P. v. Dalzell, 205 Mo.App. 207, 223 S.W. 786, 789; Fischman-Harris Realty Co. v. Kleine, Mo.App., 82 S.W.2d 605, 611; England v. Houser, 178 Mo.App. 70, 163 S.W. 890.

The question of the validity of the alleged oral contract of June 1944, relied upon by appellee as changing the method of computation of quantities of earth and rock excavated by appellee, is controlled by Missouri law. See Lange v. United States, 4 Cir., 120 F.2d 886, 889. The performance of or promise to perform an obligation previously existing under contract is not sufficient consideration to support another contract. Lingenfelder v. Wainwright Brew-

ing Co., 103 Mo. 578, 15 S.W. 844; Ochs v. Equitable Life Assurance Society, 8 Cir., 111 F.2d 848. Since appellee was obligated by the written contract of April 26, 1944, to perform the work called for by that contract for the compensation clearly expressed in it, he had no right in June 1944 to abandon the contract because, as his proof shows, the appellant refused to pay him for excavation done under the contract, computed contrary to the terms plainly provided in it. When he abandoned the performance of the contract he was obligated to perform, he became liable to appellant for damages for breach of the contract. Appellant then had the right to employ another contractor to finish the work and hold appellee for the damage resulting from his refusal to perform it, or to permit appellee to proceed with the work and to perform the obligations and receive compensation provided in the contract which he had breached. As a matter of law, there could not have been any bona fide dispute between the parties as to the method of computation of quantities of earth and rock excavated by appellee plainly and clearly provided in the written contract. As a matter of fact there was no dispute on this question. Appellant's promise to pay appellee compensation greater than that agreed upon by the parties in the written contract for performance of the work which appellee was obligated to do under that contract, if made, was not binding upon appellant because not supported by the necessary consideration.

There is no room in this case for the application of the so-called hardship rule (see Watkins & Son v. Carrig, 91 N.H. 459, 21 A.2d 591, 138 A.L.R. 131, 133), since appellee at the time he executed the written contract of April 26, 1944, was fully advised as to the conditions confronting him in the work. No Missouri case applying the hardship rule has been called to our attention by appellee, and none has been found.

For the reasons stated, I would reverse the judgment of the District Court and remand this case with directions to enter judgment for appellee for $6,929.39, the sum which the parties agree is owing to appellee if the rights of the parties are controlled by the written contract of April 26, 1944.