# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-1001

_____

Michael Barrett, IV; Brandon Kittle-Aikeley; Jacob Curliss; John Doe

*Plaintiffs - Appellees*

v.

Donald M. Claycomb, in his official capacity as President of the Linn State
Technical College Board of Regents; Toni R. Schwartz, in her official capacity as
member of the Linn State Technical College Board of Regents; John Klebba, in
his official capacity as member of Linn State Technical College Board of Regents;
Christopher T. Davidson; Diane Benetz, in her official capacity as member of Linn
State Technical College Board of Regents; Mark J. Collom; Kenneth L. Miller, in
his official capacity as member of Linn State Technical College Board of Regents;
Erick V. Kern, in his official capacity as member of Linn State Technical College
Board of Regents

*Defendants - Appellants*

------------------------------

Students for Sensible Drug Policy; Missouri Association for Social Welfare;
Missouri Chapter - National Association of Social Workers; Missouri National
Education Association; National Association of Social Workers; National
Education Association; The American Academy of Addiction Psychiatry

*Amici on Behalf of Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: September 19, 2012
Filed: January 29, 2013

_____

Before WOLLMAN, BEAM, and LOKEN, Circuit Judges.

_____

BEAM, Circuit Judge.

In this interlocutory appeal, Donald Claycomb, in his official capacity as President of the Linn State Technical College Board of Regents; along with members of the Board of Regents, also in their official capacities; appeal from the district court's grant of a preliminary injunction, which halted a mandatory drug-testing policy implemented by Linn State. Having jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1), we vacate the preliminary injunction.

## I.    BACKGROUND

Linn State Technical College ("Linn State" or "the College") is a two-year college located in Linn, Missouri. Linn State offers several programs for the roughly 1150 to 1200 students that attend the institution. On average, 500 new students begin programs at the College each year.

The programs Linn State offers can be divided into four primary categories: mechanical, electrical, civil, and computer. Each of these primary categories has further specialty areas. Many of the programs offered at Linn State involve manual exercises. For example, students in the aviation maintenance program spend roughly 62% of their time doing hands-on training, where students work in close proximity to active propeller blades. These students are also required to taxi airplanes. Students seeking accreditation in the heavy equipment operations program spend

-2-

between 51% and 72% of their time engaged in hands-on training. This work involves operating Caterpillar D6R bulldozers and other heavy equipment weighing up to twenty-five tons. Danny Joe Griffin, an instructor in the industrial electricity department, testified that students in his department spend about half their time engaged in hands-on functions. This training involves dealing with live electricity and, at times, performing electrical services for members of the community.

On June 17, 2011, Linn State's Board of Regents adopted a mandatory drug-screening policy. The policy states:

> Linn State Technical College will begin a drug screening program in the fall semester of 2011 for students who are newly classified as degree or certificate seeking and degree or certificate seeking students returning after one or more semesters of non-enrollment at the Linn State Technical College campus or any Linn State Technical College location.

The testing policy indicates that "[t]he purpose of the program is to provide a safe, healthy and productive environment for everyone who learns and works at Linn State Technical College by detecting, preventing and deterring drug use and abuse among students." The testing procedures provide that the test results do not serve law enforcement purposes and will not be revealed to law enforcement personnel.

As a condition of admission to Linn State in the fall of 2011, students were required to sign a form acknowledging the new drug-testing policy and also acknowledging that refusing to screen would result in administrative or student-initiated withdrawal. The condition of admission also explained to students that if a test returned positive, the student would have 45 days "to rescreen and test negative to remain enrolled."

In conjunction with the new policy, on September 6, 2011, Linn State issued a series of procedures by which it would conduct the drug screening. The written

procedures provided that students could "petition the Office of the President for a waiver of the general requirement to participate in the Drug Screening Program." According to the procedures, "[t]he student may advance any justification for the request." If a student filed a petition, President Claycomb testified that he would consider the student's reason and consult other personnel at the College, and possibly legal counsel, before he rendered a decision. On September 7, 2011, Linn State began drug testing students.

On September 14, after providing urine samples in accordance with the drug-testing policy, Michael Barrett, IV, and other named individuals (collectively, Appellees) commenced action on behalf of an enumerated class[1] against members of the Board of Regents, including President Claycomb. The complaint alleged that Linn State's drug-testing policy constituted a search that violated the Fourth Amendment. Appellees sought a declaration that the drug-testing policy was facially unconstitutional and further sought injunctive relief. Accompanying the complaint, Appellees filed motions for a temporary restraining order and a preliminary injunction. On September 14, after holding a teleconference on the temporary restraining order, the district court "granted the Motion enjoining any further testing of samples and any reporting of results to the school." The parties agreed to have the temporary restraining order extend to October 25, 2011, and the court entered an order reflecting this joint stipulation.

On October 25, 2011, the district court held a hearing on Appellees' motion for a preliminary injunction. In determining whether to grant the preliminary injunction,

---

[1]On November 15, 2011, three days before it granted the preliminary injunction, the district court certified as a class "current, and future, students of Linn State Technical College who are, or will be, seeking degrees or certificates at the main campus of the College in Linn, Missouri, or any other Linn State Technical College location."

the district court applied this circuit's <u>Dataphase</u>[2] factors and thus evaluated the merits of Appellees' case. The court determined that Appellees had to establish a "fair chance" of success on the merits, but, in the district court's view, even under the more rigorous "likely to prevail" standard, the Appellees had met their burden because "Defendants' drug testing program will fail Fourth Amendment scrutiny because it is over broad." Accordingly, the court issued a preliminary injunction. This appeal followed.

## II.    DISCUSSION

Linn State raises two assignments of error on appeal: (1) the district court erred in granting the preliminary injunction, and (2) the order issuing the preliminary injunction failed to provide sufficient specificity in violation of Federal Rule of Civil Procedure 65(d)(1). Given our disposition of this case, we need only address the first issue. We review a district court's decision to grant a preliminary injunction for an abuse of discretion. <u>Planned Parenthood Minn., N.D., S.D., v. Rounds</u>, 530 F.3d 724, 733 (8th Cir. 2008) (en banc). "An abuse of discretion occurs where the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." <u>Id.</u> (quotation omitted). We afford the district court no deference in reviewing its legal conclusions. <u>S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.</u>, 696 F.3d 771, 776 (8th Cir. 2012).

In <u>Dataphase</u>, our court outlined four factors district courts should consider in determining whether to grant preliminary injunctive relief: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." 640 F.2d at 114. Since <u>Dataphase</u>, we have observed that the "likelihood of success on

---

[2]<u>Dataphase Sys., Inc. v. C L Sys., Inc.</u>, 640 F.2d 109 (8th Cir. 1981) (en banc).

the merits is most significant." Wilson, 696 F.3d at 776 (quotation omitted). To that end, "the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." CDI Energy Srvs., Inc. v. West River Pumps, Inc., 567 F.3d 398, 402 (8th Cir. 2009). We thus turn to this factor.

Our resolution of the present matter depends heavily on the nature of the relief Appellees sought by way of a preliminary injunction. In their complaint, Appellees sought a declaration that Linn State's mandatory drug-testing policy was facially unconstitutional and sought injunctive relief on behalf of all members of the class. Because Appellees raise a facial challenge under the Fourth Amendment,[3] they must establish some degree of success on the merits[4] that the drug-testing policy is facially unconstitutional. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). This rigorous standard applies equally to those facially challenging administrative regulations, see Sherbrooke Turf, Inc. v. Minn. Dep't of Transp., 345 F.3d 964, 971 (8th Cir. 2003), as well as state-school enacted

---

[3]The Fourth Amendment applies to the states through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 655 (1961).

[4]In Rounds, we decided that parties moving to preliminarily enjoin a statute or regulation must establish that they are "likely to prevail on the merits," because such promulgations came about by a "presumptively reasoned democratic process[]." 530 F.3d at 732 (quotation omitted). But when the movants seek "to enjoin something other than government action based on presumptively reasoned democratic processes," the court opined, the movants need only establish a "fair chance of prevailing." Id. The parties dispute which of these two standards applies to this case. The district court determined the "fair chance" standard applied but also concluded that Appellees had satisfied the heightened "likely to prevail" standard. We need not resolve which standard applies, however, as we land wholly at odds with the district court, concluding that even under the lesser "fair chance" standard, Appellees have not satisfied their burden.

policies, see Tipton v. Univ. of Haw., 15 F.3d 922, 925 (9th Cir. 1994). Ultimately, if Linn State's mandatory drug-testing policy "could conceivably" be implemented in such a way as to comply with the Fourth Amendment, Appellees' facial challenge must fail. Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 456 (2008).

The Fourth Amendment ensures "[t]he right of people to be secure in their persons . . . against unreasonable searches and seizures." Government-ordered collection and testing of urine constitutes a search under the Fourth Amendment. Chandler v. Miller, 520 U.S. 305, 313 (1997). Generally, the Fourth Amendment requires "individualized suspicion of wrongdoing" for a search to be reasonable. Id. However, "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665 (1989). In cases "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement," the traditional Fourth Amendment requirements in the criminal context do not apply. Id. Rather, "it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." Id. at 665-66.

In the instant case, Linn State's drug-testing policy is not designed to accomplish the general needs of law enforcement. We know this is true because the policy's written implementation procedures say as much: "The Drug Screening Program shall not be used for law enforcement purposes. No information regarding screening outcomes shall be released to law enforcement." Instead of law enforcement purposes, Linn State maintains that the purpose of the drug-testing policy is to "provide a safe, healthy and productive environment . . . by detecting, preventing and deterring drug use and abuse among students." After reviewing the record, we are satisfied that safety was a primary consideration, among others, behind

Linn State's actions. Thus, the permissibility of Linn State's drug testing program depends on the balance between the public's safety interest and the students' privacy interest. Chandler, 520 U.S. at 314.

If Supreme Court precedent teaches us anything in this area, it certainly makes clear that the public has a "surpassing safety interest" in ensuring that those in "safety-sensitive" positions have uninhibited judgment. Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 620, 634 (1989); see also Von Raab, 489 U.S. at 668-70; Chandler, 520 U.S. at 314-17. In Skinner, the Supreme Court held that the government had demonstrated a compelling interest in drug testing certain railroad employees without suspicion because "[e]mployees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." 489 U.S. at 628. Similarly, in Von Raab, the Court highlighted public safety concerns for Customs officials engaged in drug interdiction, and determined that the public had an interest in ensuring that these individuals remain drug-free. 489 U.S. at 670-71. In actions flowing from these Supreme Court decisions, lower courts have allowed drug-testing in other safety-sensitive occupations. See Krieg v. Seybold, 481 F.3d 512, 518 (7th Cir. 2007) (collecting cases that allowed testing of aviation personnel, railroad safety inspectors, highway and motor carrier safety specialists, lock and dam operators, forklift operators, tractor operators, engineering operators, and crane operators).

With instruction from Skinner and Von Raab, we conclude the public has a valid interest in deterring drug use among students engaged in programs posing significant safety risks to others. Indeed, Linn State offers several programs and areas of study, many of which require students to work with potentially dangerous heavy equipment, machines, chemicals, and electricity. Students operating the heavy equipment, for instance, "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences."

Skinner, 489 U.S. at 628. And the potential hazards associated with Linn State's safety-sensitive programs are not confined to its campus, as some students are required to participate in internships that affect society at large.

Against this substantial public safety interest, "we must weigh the interference with individual liberty that results from requiring [Linn State students] to undergo a urine test." Von Raab, 489 U.S. at 671. Three factors guide this analysis: (1) "the nature of the privacy interest allegedly compromised by the drug testing"; (2) "the character of the intrusion imposed by the Policy"; and (3) "the nature and immediacy of the government's concerns and the efficacy of the Policy in meeting them." Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 830, 832, 834 (2002).

We begin examining the nature of the college students' privacy interest with an understanding that in certain contexts persons have a diminished expectation of privacy. Von Raab, 489 U.S. at 671. For example, in the public school context, children have a diminished expectation of privacy, and this expectation becomes even more diminished for school children engaged in extracurricular activities and athletics. Earls, 536 U.S. at 830-32. Likewise, in Skinner, the Court recognized that the railroad employees at issue had a diminished privacy expectation "by reason of their participation in an industry that is regulated pervasively to ensure safety." 489 U.S. at 627. Here, following Skinner, we think some college students that attend Linn State have a diminished expectation of privacy because they are seeking accreditation in heavily regulated industries and industries where drug testing, in practice, is the norm.

Next, we examine the character of the privacy intrusion. Earls, 536 U.S. at 832. The methods employed to conduct the suspicionless drug testing are relatively noninvasive. Indeed, Linn State's written procedures inform the students that the

testing will be conducted in accordance with federal drug-testing procedures outlined in 49 C.F.R. Part 40, which "significantly minimize the program's intrusion on privacy interests." Von Raab, 489 U.S. at 672 n.2 (reviewing drug-testing procedures for Customs officials). The testing is not random and students are given notice of the testing and procedures used. The testing does not reveal any medical condition about the student other than the presence of certain drugs, and any positive results are not relayed to law enforcement. Therefore, Linn State's "procedures significantly minimize the intrusiveness of [Linn State's] drug-screening program," id. at 673 n.2, and "the invasion of students' privacy is not significant," Earls, 536 U.S. at 834.

Finally, we consider "the nature and immediacy of the government's concerns and the efficacy of the Policy in meeting them." Id. As we have noted above, Linn State's primary concern is safety. But Appellees question this concern because no evidence indicates that Linn State students have a drug problem or that any drug-related accidents have occurred at Linn State. True, the record is devoid of such evidence; however, the Supreme Court has never "required a particularized or pervasive drug problem before allowing the government to conduct suspicionless drug testing." Id. at 835. Rather, the Supreme Court has highlighted that our country faces a generalized "nationwide epidemic of drug use." Id. at 836. Moreover, the record does contain evidence indicating some Linn State students are actively using drugs and even coming to school under the influence. Thus, it seems counterintuitive to require Linn State to await drug-abuse and drug-related accidents before it can institute the new drug-testing policy. See id. at 836. In the end, "the need to prevent and deter the substantial harm" that can arise from a student under the influence of drugs while engaging in a safety-sensitive program "provides the necessary immediacy" for Linn State's testing policy. Id.

However, Appellees argue that a one-time, prescheduled drug screening is not effective because students can simply abstain from drug use until after they pass the

test. While it is true that random testing may be a more effective deterrent, we are aware of no case, and Appellees have cited none, where the failure to adopt the most effective drug-testing policy was reason enough to override a substantial public-safety interest. For this reason, we find unpersuasive Appellees' citation to <u>Chandler</u> in support of their efficacy argument, because in that case, the Court was not dealing with safety-sensitive positions and no real hazard was involved. 520 U.S. at 319 (determining that the state failed to establish a special need to drug test candidates for office because the record lacked "any indication of a concrete danger").

Accordingly, based on the current record, after evaluating Linn State's proffered special needs and balancing the public and private interests at issue, we hold the district court erred in determining that Linn State lacked a special need and Appellees had established the requisite probability of success on the merits. Our holding, however, is closely linked to the nature of the relief Appellees sought in this case. In granting the preliminary injunction, the district court reasoned that the drug-testing policy would not likely survive Fourth Amendment scrutiny because "[m]any students who have been tested are not involved with heavy equipment and hazardous working conditions at the college." But this conclusion ignores the nature of a facial challenge and the difficulty of prevailing on such challenge under the Fourth Amendment. <u>See</u> <u>Warshak v. United States</u>, 532 F.3d 521, 529 (6th Cir. 2008) (en banc) ("The Supreme Court has been especially reluctant to invalidate statutes on their face under the Fourth Amendment.").

Here, Appellees did not seek relief based only on the circumstances of students currently being tested but also on the circumstances of a group of unknown, future students. <u>Cf.</u> <u>Am. Fed'n of State Cnty. and Mun. Emps. Council 79 v. Scott</u>, 857 F. Supp. 2d 1322, 1342 (S.D. Fla. 2012) (determining plaintiffs commenced an as-applied challenge to drug-testing program because complaint challenged program as it applied to current employees and did not challenge program as it related to future

employees). As we read Appellees' motion and the district court's order, the preliminary injunction enjoins Linn State from testing any students pursuant to its new policy, even unknown, future students and students involved in safety-sensitive programs. On this facial challenge, we would have to speculate as to the facts surrounding the testing of future students. For all we know, every future student could enroll in a program where suspicionless testing would be constitutionally permitted. Although Linn State's drug-testing policy may have some unconstitutional applications, we are unable to say that it is unconstitutional on its face in every conceivable circumstance.[5] If Appellees wanted to challenge the drug-testing policy on the specific facts, focusing only on those current students whose studies did not involve a safety-sensitive program, they could have lodged an as-applied challenge–"the basic building block[] of constitutional adjudication." Gonzales v. Carhart, 550 U.S. 124, 168 (2007) (quotation omitted). Consequently, in evaluating the probability of Appellees' success on the merits, we think the district court erred in ignoring the substantial obstacles this facial challenge presented for Appellees and therefore abused its discretion in issuing such a broad injunction.

---

[5]We recognize that in Nat'l Fed'n of Fed. Emps.-IAM v. Vilsack, 681 F.3d 483, 489 (D.C. Cir. 2012), the D.C. Circuit refused to apply the "no set of circumstances" rule to a facial challenge against a government drug-testing policy. There, the court refused to apply this rule because, in its view, "[w]hen assessing the reasonableness of the Fourth Amendment intrusion by [drug-testing] policies, . . . the Supreme Court has differentiated between job categories designated for testing, rather than conducting the balancing test more broadly." Id. However, we do not read the Supreme Court's Fourth Amendment, drug-testing jurisprudence as placing a limit on the broad circumstances facial challenges ordinarily present. See Skinner, 489 U.S. at 614, 633 n.10 ("[R]espondents have challenged the administrative scheme on its face. We deal therefore with whether the tests contemplated by the regulations can *ever* be conducted.").

Given that Appellees have failed to show a fair chance of prevailing on their facial challenge, we find it unnecessary to analyze the remaining Dataphase factors under present circumstances.

## III. CONCLUSION

We vacate the preliminary injunction.

_____