Michael BARRETT, IV,
et al., Plaintiffs,

v.

Donald CLAYCOMB, et
al., Defendants.

No. 2:11–CV–04242–NKL.

United States District Court,
W.D. Missouri,
Central Division.

March 22, 2013.

Anthony E. Rothert, Grant R. Doty, American Civil Liberties Union of Eastern MO, St. Louis, MO, Jason D. Williamson, New York, NY, for Plaintiff.

Kent L. Brown, Kent L. Brown, P.C., Jefferson City, MO, for Defendant.

## ORDER

NANETTE K. LAUGHREY, District Judge.

Before the Court is Plaintiffs' motion for a preliminary injunction [Doc. # 139]. For the reasons set forth below, Plaintiffs' motion is GRANTED and a preliminary injunction is issued, with the language of the same set out at the conclusion of this Order.

### I. Background

Linn State Technical College ("Linn State") is a public two-year college located in Linn, Missouri, which was established and continues to operate under Missouri statutes. Linn State offers about twenty different programs for the roughly 1,150 to 1,200 students who attend the institution. On average, 500 new students enroll at Linn State each year. The programs offered by Linn State can be divided into four, general divisions: mechanical, electrical, civil, and computer. Each of these programs is further divided into more specialized areas. As a technical school, many of the programs offered by Linn State involve a substantial component of hands-on training and manual exercises.

On June 17, 2011, Linn State's Board of Regents adopted a mandatory drug-screening policy. Beginning in the fall of 2011, Linn State students were required, as a condition of admission, to sign a form acknowledging the new drug-testing policy and that refusal to participate in the testing program would result in administrative or student-initiated withdrawal. On September 6, 2011, Linn State issued a series of procedures by which it would conduct the drug testing. These written procedures provided, *inter alia*, that students could petition Linn State's President to be excused from participation in the drug-testing program. Linn State began drug testing students on September 7, 2011.

On September 14, 2011, the named Plaintiffs initiated this action and immediately moved to enjoin Linn State's testing program. After an October 25, 2011 hearing on Plaintiffs' motion for a preliminary injunction, the Court granted the motion. Defendants then filed an interlocutory appeal challenging this decision.

On January 29, 2013, the Eighth Circuit Court of Appeals vacated the preliminary injunction. *Barrett v. Claycomb*, 705 F.3d 315, 318 (8th Cir.2013). This decision was based "heavily on the nature of the relief [Plaintiffs] sought by way of a preliminary injunction." *Id.* at 320–21, 324 ("Our holding ... is closely linked to the nature of the relief [Plaintiffs] sought in this case."). Specifically, because Plaintiffs brought a facial challenge to Linn State's testing policy, they had to "establish some degree of success on the merits" that "no set of circumstances exists under which the [drug-testing policy] would be valid." *Id.* at 321 (quotation omitted). In concluding

that Plaintiffs had failed to satisfy this requirement, the court remarked, "Although Linn State's drug-testing policy may have some unconstitutional applications, we are unable to say that it is unconstitutional on its face in every conceivable circumstances." *Id.* at 324. The Court of Appeals particularly objected to the prior injunction's application to unknown, future students because, in theory, "every future student could enroll in a program where suspicionless testing would be constitutionally permitted." *Id.*

Following this decision, Plaintiffs abandoned their facial challenge and elected to proceed on the theory that the policy was unconstitutional as applied to the students tested in September 2011. Plaintiffs accordingly moved to enjoin any further testing or the reporting of the results of the testing of the samples taken in September 2011.

Subsequently, several teleconferences were held in an effort to reach an agreement on how to maintain the status quo, with due regard for the constitutional applications of the drug-testing policy recognized by the Court of Appeals, while trying the merits of Plaintiffs' as-applied challenge, but no agreement was reached. The parties each provided supplemental briefings on the current motion for a preliminary injunction and agreed that the Court should consider the evidence presented at the October 25, 2011 hearing on Plaintiffs' first motion for a preliminary injunction. The parties were also offered the opportunity to present additional evidence, but they declined to do so. Consequently, the Court is again in the position of having to resolve the preliminary injunction motion on an incomplete factual record.

## II. Discussion

██ Plaintiffs move for a preliminary injunction pending the resolution of their as-applied challenge to Linn State's drug-testing policy. In deciding whether to grant injunctive relief, the Court considers four factors: " '(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.' " *Barrett v. Claycomb,* 705 F.3d 315, 320 (8th Cir.2013) (quoting *Dataphase Sys., Inc. v. C L Syst., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (en banc)). The Eighth Circuit's decision on the interlocutory appeal addressed only the "most significant" of these factors: the likelihood of success on the merits. *Id.* (quoting *S.J.W. ex rel. Wilson v. Lee's Summit R–7 Sch. Dist.,* 696 F.3d 771, 776 (8th Cir.2012)).

As such, the Eighth Circuit's decision did not disturb the Court's prior findings on the other three preliminary injunction factors and the parties have submitted no new evidence or argument with respect to these factors. The Court thus adopts its prior conclusions as to these three factors, for the reasons set forth in its Order dated February 18, 2011. *See* [Doc. # 99]. Accordingly, a preliminary injunction should issue if Plaintiffs can show the requisite likelihood of success on the merits.

Plaintiffs proceed on the theory that Linn State's drug-testing policy was unconstitutional as applied to some or all of the students tested in September 2011. The Court of Appeals' decision on the interlocutory appeal did not address this issue, though it did suggest that the policy may have unconstitutional applications. *Barrett,* 705 F.3d at 324 ("Although Linn State's drug-testing policy may have some unconstitutional applications, we are unable to say that it is unconstitutional on its face in every conceivable circumstance."). Before considering the likelihood that

Plaintiffs will succeed on their as-applied challenge, however, the Court must address the degree of success on the merits that Plaintiffs must show at this stage.

### A. The Fair Chance of Prevailing Standard Applies

 The Eighth Circuit has articulated two standards for determining whether a moving party has established a likelihood of success on the merits. "[P]arties moving to preliminarily enjoin a statute or regulation must establish that they are 'likely to prevail on the merits,' because such promulgations came about by a 'presumptively reasoned democratic process[ ].' " *Barrett*, 705 F.3d at 324 n. 4 (quoting *Planned Parenthood Minn., N.D., S.D v. Rounds*, 530 F.3d 724, 732 (8th Cir.2008) (en banc)). By contrast, the Court should apply the less rigorous " 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes." *Rounds*, 530 F.3d at 732. The Court of Appeals did not decide which of these standards applies to Linn State's drug-testing policy. *Barrett*, 705 F.3d at 324 n. 4.

 The basis for the distinction between these two standards, however, supports the application of the fair chance standard in this case. Application of the "more rigorous standard 'reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.' " *Rounds*, 530 F.3d at 732 (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995) (per curiam)). Based on this reasoning from the Second Circuit's decision in *Able*, the *Rounds* court held that motions to enjoin the implementation of state and federal statutes must satisfy the more rigorous standard. *Rounds*, 530 F.3d at 731–33, 732 n. 6. Regarding motions to enjoin "administrative actions by federal, state or local government agencies," the *Rounds* court "note[d] that the Second Circuit has examined the circumstances surrounding such government actions to determine to what extent the challenged action represents 'the full play of the democratic process' and, thus, deserves the deference of the [more rigorous] test." *Rounds*, 530 F.3d at 732 n. 6 (citing *Able*, 44 F.3d at 131–32).

An examination of the circumstances surrounding the development and implementation of Linn State's drug-testing policy shows that this policy does not warrant the deference that is afforded to duly enacted statutes. The policy was initially developed by Linn State administrators with only limited and informal input from faculty members. [Doc. # 92 at 112–13]. Linn State administrators then presented the policy to the Board of Regents, which approved it. [Doc. # 92 at 24, 128–29]. Members of the Board of Regents are appointed by the Governor and confirmed by the Senate. [Doc. # 92 at 14]. Regents are typically appointed for six-year terms, but many appointees continue to serve after their term has expired, until they resign or are replaced by the Governor. [Doc. # 92 at 14–15]. Dr. Donald Claycomb, President of Linn State, testified that a number of Regents are serving unexpired terms. [Doc. # 92 at 15]. After a policy is approved by the Board of Regents, the implementation of the policy is delegated to Linn State's President who, in turn, delegates this task to the appropriate staff. [Doc. # 92 at 16]. Dr. Richard Pemberton, Linn State's Associate Dean of Student Affairs, testified that the policy in this case continued to evolve even after it was approved by the Board of Regents. [Doc. # 129 at 92].

In short, the drug-testing policy was designed and implemented by Linn State's administration and the only democratic check on this process was approval by a body of gubernatorial appointees who are largely insulated from public pressure and oversight. There is no indication that the policy was presented for public notice and comment like administrative regulations or that the policy was ever submitted for approval by any elected official. The procedure for adopting this policy thus fell far short of the "full play of the democratic process" and, accordingly, the fair chance of prevailing standard applies. *See Rounds*, 530 F.3d at 732 n. 6. Thus, the question presented is whether Plaintiffs have shown a fair chance of prevailing on the merits of their as-applied claims.

### B. The Policy Was "Applied" to the Students Tested in September 2011

 Defendants argue that Plaintiffs cannot succeed on an as-applied challenge because the drug-testing policy was never actually applied to the students who were tested in September 2011. Citing the policy's procedure whereby a student could petition the President to be excused from participation in the drug-testing program, Defendants maintain that the policy was never applied in its entirety, because there is no evidence that any Plaintiff ever petitioned for an exemption. In Defendants' view, a student must appeal to the President to be excused from the testing and have the request denied before the student can bring an as-applied challenge to the program. If a student does not appeal to the President, Defendants contend that student cannot claim that the policy was applied to her, even if the student in fact submitted a urine sample in compliance with the policy.

While there is no evidence that any Plaintiff petitioned the President to be excused from the drug-testing program, there is no question that Plaintiffs' urine was collected and tested pursuant to Linn State's drug-testing policy. This is the unconstitutional act alleged by Plaintiffs. It is difficult to see how the absence of a petition to the President means that the policy was not "applied" when Plaintiffs' urine was, in fact, collected and tested in accordance with this policy. Under Defendants' theory, a state actor can impose a mandatory, suspicionless search on a broad population so long as it permits the targets of the search to make a discretionary appeal to the actor conducting the search. In this scenario, Defendants' position is that, after the search is performed, any individuals who did not file an appeal for an exemption cannot challenge the search, even if they were actually subjected to an unconstitutional search. The Court is not aware of, and Defendants have not cited, any authority that supports the proposition that individuals can be required to "opt-in" to their constitutional rights or lose their ability to sue for their infringement.

The analysis might be different if the petition procedure simply permitted any student, for any reason, to unilaterally withdraw from participation in the drug-testing program with no repercussions. In that case, those students who did submit urine samples may, arguably, be said to have done so consensually. But the evidence in this case makes clear that there was no guaranteed result for a student who petitioned to be excused from the program. [Doc. # 92 at 36–37]. In fact, Defendants' own argument explicitly acknowledges that the President could, in his discretion, deny such a request.

Furthermore, there were no clear standards by which a petition to be excused from testing would be judged. When Dr. Claycomb testified at the preliminary injunction hearing, he could not identify any

specific factors that would guide his decision on a petition for exemption. [Doc. # 92 at 36–37]. There is certainly no evidence that students were informed that the coursework required by the program in which they were enrolled, which the Eighth Circuit identified as the controlling factor with respect to the constitutionality of the drug testing program, might be a basis for exemption. In fact, the acknowledgment form signed by the students and the list of frequently asked questions about the testing program prepared by Linn State stated only that failure to participate in the program would result in administrative or student-initiated withdrawal. [Doc. # 92 27–28, 33]. Neither of these documents mentioned the opportunity to petition to be excused or the criteria by which such a petition would be judged.

In sum, a student's failure to pursue a discretionary, uncertain, and seemingly arbitrary process for seeking an exemption from the testing program does not mean that the policy was not applied to that student. The policy was applied when the students were compelled to submit their urine for testing. The availability of the petition procedure might bear on the overall reasonableness of the search, but the failure to file a petition does not preclude Plaintiffs from challenging the policy as it was applied to them.

### C. There Is a Fair Chance that Linn State's Drug–Testing Policy Was Unconstitutionally Applied in September 2011

 Having decided on the applicable standard and having found that the drug-testing policy was applied to Plaintiffs, the next question is whether Plaintiffs have shown a fair chance that the collection and testing of their urine violated the Constitution. The Fourth

Amendment "generally bars officials from undertaking a search or seizure absent individualized suspicion." *Chandler v. Miller*, 520 U.S. 305, 308, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). It is undisputed that Linn State lacked individualized suspicion for the students tested in September 2011.[1] But there is also a "closely guarded category of constitutionally permissible suspicionless searches." *Id.* at 309, 117 S.Ct. 1295. Specifically:

> "[W]here a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement," the traditional Fourth Amendment requirements in the criminal context do not apply.... Rather, "it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context."

*Barrett*, 705 F.3d at 321 (quoting *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665–66, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)). "When such 'special needs' ... are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Chandler*, 520 U.S. at 314, 117 S.Ct. 1295. To justify suspicionless drug testing, "the proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Id.* at 318, 117 S.Ct. 1295.

The special need proffered by Defendants and adopted by the Court of Appeals as justifying Linn State's drug-testing poli-

---

**1.** It is well-settled that "[g]overnment-ordered collection and testing of urine constitutes a search under the Fourth Amendment." *Barrett*, 705 F.3d at 321.

cy is the "interest in deterring drug use among students engaged in programs posing significant safety risks to others." *Barrett,* 705 F.3d at 322. It is clear from the Court of Appeals' decision that the constitutionality of the drug-testing policy depends on a student's enrollment in a program that implicates this special need. *See id.* at 324–25 ("For all we know, every future student could *enroll in a program* where suspicionless testing would be constitutionally permitted.... If Appellees wanted to challenge the drug-testing policy on the specific facts, focusing only on those current students *whose studies did not involve a safety-sensitive program,* they could have lodged an as-applied challenge ...." (emphasis added)). Plaintiffs argue that Linn State's drug-testing policy was unconstitutional as applied to them because there is no evidence that the students tested in September 2011 were enrolled in programs that posed significant safety concerns to others. Defendants respond that the evidence of record shows that every program offered by Linn State implicates these concerns.

Defendants' position is contradicted, however, by the evidence presented during the October 25, 2011 hearing. For example, Aaron Kliethermes, Department Chair for the Design Drafting Technology Program, provided the following description of the typical lab courses taken by students in the drafting program:

> They do manual drafting on a drafting board. They use pencil and paper, and they use manual drafting tools to create drawings in the mechanical field. And then the other one is computer-aided drafting on computer software in the computer lab set up for about 20 students.

[Doc. # 92 at 61]. Mr. Kliethermes also described a portion of the drafting program during which students travel to and inspect construction sites:

> Some of the job sites that we do go through and take them to, they do require hard hats, they do require some safety glasses in some of the areas. We go to them, we just visit, we look—we talk to the engineer, we look at the plans to make sure, you know, we understand what they're talking about and we actually see the building or the bridge or whatever, the design is going up.

[Doc. # 92 at 63]. Asked whether the students went out onto an unfinished bridge during one of these site visits, Mr. Kliethermes responded, "We actually stood at the end of the bridge, but we actually walked around uneven ground because the approaches and deproaches (sic) were not done." [Doc. # 92 at 64].

Finally, Mr. Kliethermes testified that students in a second-year architectural class in the drafting program design a structure and that most of these designs are ultimately built. [Doc. # 92 at 65]. But Mr. Kliethermes also testified that when a student produces a design drawing, "we actually go through and have somebody else look at it before it's built." [Doc. # 92 at 68]. According to Mr. Kliethermes, the only way a drafting student's design could be built without instructors or professionals reviewing it first would be for the student to go out and build it on her own. [Doc. # 92 at 68]. But Mr. Kliethermes could not recall a single instance of "a student actually building something." [Doc. # 92 at 68].

From this testimony, it does not appear that enrollment in Linn State's drafting program implicates significant safety concerns that might be substantial enough to override these students' constitutional rights. *See Chandler,* 520 U.S. at 318, 117 S.Ct. 1295 ("[T]he proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently

vital to suppress the Fourth Amendment's normal requirement of individualized suspicion."). To the extent that this program involves any safety risks at all, they appear limited to the possibility that a student might accidentally hurt herself, such as by stumbling or falling while navigating uneven ground during a site visit. But the special need identified by the Court of Appeals was concern over drug use by students "in programs posing significant safety risks *to others*." *Barrett*, 705 F.3d at 322 (emphasis added).

Other than Mr. Kliethermes' purely speculative suggestion that a student might somehow go about self-constructing a design that was not reviewed by a teacher or other professional, there is no evidence that drafting students ever engage in activities that could pose a safety risk to others. Furthermore, even if a student did try to construct her own design, this would be a self-directed and entirely extracurricular undertaking that would be neither required nor condoned by Linn State's drafting program. Surely hypothetical considerations about what students might choose to do on their own time outside of class cannot provide a special need that justifies mandatory suspicionless drug testing. Otherwise, concern that a student might drive a vehicle under the influence of a drug would seemingly provide the requisite special need to justify such a testing program.

In addition to the design drafting program, a number of other programs at Linn State also appear unlikely to implicate significant safety concerns. These include the business systems specialist program, computer programming, network systems technology, and telecommunications. [Doc. # 92 at 12–14]. Though the record is currently undeveloped regarding the substantive coursework required by these programs, common sense suggests that students in these programs do not engage in activities that pose a significant safety risk to others. In fact, Dr. Richard Pemberton testified that the business operations program is among the programs that would be more likely to be exempt from testing because of the relative lack of substantial safety concerns. [Doc. # 154–55]. In addition, the computer programming advisory council opposed the drug-testing policy on the ground that computer programming "is. not a field that requires random drug testing." [Doc. # 92 at 148].

Thus, the record shows that at least some students enrolled at Linn State do not pursue programs that include activities that pose significant safety concerns to others. While the record is undeveloped regarding the program requirements for each member of the class, six Plaintiffs submitted affidavits averring that they are enrolled in programs that do not use heavy machinery. [Docs. # # 5–1; 5–2; 5–3; 26–1; 26–2; 26–3]. In any event, of the more than 490 students tested in September 2011 [Doc. # 92 at 35], there is at least a fair chance that some of them were enrolled in the non-dangerous programs discussed above.

With respect to these students, Defendants have not shown the existence of a special need that might justify an exception to the general rule that prohibits suspicionless searches and seizures. In the absence of such a special need, the suspicionless testing is presumptively unreasonable and Plaintiffs have thus shown a fair chance of prevailing on their challenge to Linn State's policy. *See Lebron v. Sec'y, Fla. Dep't of Children & Families*, 710 F.3d 1202, 1207 (11th Cir.2013) ("[T]he Supreme Court has required the government to make a threshold showing that there are special needs, . . . [which] make the warrant and probable-cause requirement impracticable. . . . Only if the government is able to make a showing of

substantial special needs will the court thereafter undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties, to determine the reasonableness of the search." (quotation and citation omitted)).

That said, there is no question that students enrolled in some programs at Linn State may constitutionally be subjected to the drug-testing policy. In particular, it seems clear that students enrolled in the aviation maintenance, heavy equipment operations, and industrial electricity programs may be lawfully tested. *See Barrett*, 705 F.3d at 319, 322. Consequently, any preliminary injunction should not apply to urine samples obtained from students who were enrolled or who have since enrolled in these programs. Students enrolled in other programs that require working with "dangerous heavy equipment, machines, chemicals, and electricity" may also be subject to drug testing, depending on the risks involved in their work. *See Barrett*, 705 F.3d at 322. But Defendants have thus far declined to submit a list of what they believe to be the programs at Linn State that implicate the significant safety concerns identified by the Eighth Circuit. If Defendants believe additional programs meet the criteria set out in the Court of Appeals' decision, Defendants may seek to modify the terms of any preliminary injunction to exclude students who were or have enrolled in these programs.

### 1. Whether the Possibility of Cross–Enrollment Justifies Testing Every Incoming Student

Defendants alternatively argue that, even if not every program at Linn State raises significant safety concerns, the existence of some dangerous programs justifies testing all incoming students. This argument is based on the fact that students sometimes take courses outside of their designated programs. Under this theory, students enrolled in non-dangerous programs may still be tested because it is possible that these students will elect to take courses in other programs that involve safety-sensitive activities.

As the record currently stands, however, it is not clear that this concern is substantial enough to defeat Plaintiffs' claims. For instance, Mr. Kliethermes testified that one student in the drafting design program was taking a welding class and that another was trying to get into a machine tool class. [Doc. # 92 at 65]. But it is not clearly established that a welding or machine tool class involves activities that pose "significant safety risks to others." *Barrett*, 705 F.3d at 322. Furthermore, there is no evidence as to what extent, if at all, students from other seemingly non-dangerous programs, such as computer programming, cross-enroll in more dangerous programs and, more specifically, courses within those programs that involve work that poses a significant safety risk to others. For example, Danny Griffin, an instructor in the industrial electricity department, testified that students from other programs "occasionally" take his classes, but only "[i]f it's something that's not an upper level class." [Doc. # 92 at 106, 108]. Without more, it is not possible to discern whether these students are cross-enrolling from the non-dangerous programs identified above or whether the lower level classes in the industrial electricity program involve work that poses a significant safety risk to others. Consequently, at this time, it is not apparent that the potential for students in non-dangerous programs to cross-enroll gives rise to the type of "substantial" special need that is required to justify mandatory, suspicionless drug-testing. *See Chandler*, 520 U.S. at 318, 117 S.Ct. 1295 ("Our precedents establish that the proffered special

need for drug testing must be substantial....").

 Furthermore, if the mere possibility of cross-enrollment was sufficient to justify mandatory, suspicionless drug testing, then seemingly every public university in the country could constitutionally adopt such a policy. Nearly every school could likely identify a course or courses that entail some work that poses a safety risk to others. Considering the frequency with which college students change their majors, these schools might plausibly claim that every incoming student could potentially enroll in such a safety-sensitive class. This would effectively override the requirement "that a state must present adequate factual support that there exists a 'concrete danger,' ... not simply conjecture 'that there is a substantial 'special need.'" *Lebron,* 710 F.3d at 1213 (quoting *Chandler,* 520 U.S. at 319, 117 S.Ct. 1295).

Finally, even if cross-enrollment did give rise to a special need, this does not compel a finding that the drug-testing policy is constitutional. Rather, the permissibility of the policy would still depend upon the balance between this special need and the students' privacy interest. *Barrett,* 705 F.3d at 322. The Eighth Circuit's decision on the interlocutory appeal rested in part on the finding that "some college students that attend Linn State have a diminished expectation of privacy because they are seeking accreditation in heavily regulated industries and industries where drug testing, in practice, is the norm." *Barrett,* 705 F.3d at 323. Under Defendants' cross-enrollment theory, every student at Linn State would seemingly have a diminished expectation of privacy because they might change programs and seek accreditation in one of these heavily regulated industries. If this were the rule, then every college student in the country would have a diminished expectation of privacy as long as their school offered a program aimed at

accreditation in one of these industries. As this Court does not read the Eight Circuit's opinion as adopting such an unprecedented and far-reaching rule, the Court cannot, at this time, conclude that Defendants' cross-enrollment argument presents a special need sufficient to defeat Plaintiffs' claim.

## III. Conclusion

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction [Doc. # 139] is GRANTED. It is hereby ORDERED that Defendants, their successors, officers, agents, servants, employees, attorneys, and all persons acting in concert with them or in connection with them are hereby prohibited from conducting any further testing or reporting the results of any testing of the urine specimens collected in September 2011, pursuant to the challenged drug-testing policy. This preliminary injunction will remain in effect until this case is decided on its merits. This preliminary injunction does not apply to any drug testing other than the testing conducted pursuant to the June 17, 2011 drug-testing policy that is at issue in this case. In addition, this preliminary injunction does not apply to urine specimens collected from students who were or who have since enrolled in Linn State's aviation maintenance, heavy equipment operations, and industrial electricity programs.