# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-3521

_____

Home Instead, Inc.

*Plaintiff - Appellee*

v.

David Florance; Michelle Florance; Friend of a Friend, Inc.

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 15, 2013
Filed: July 16, 2013

_____

Before RILEY, Chief Judge, MELLOY and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Home Instead, Inc. ("Home Instead") filed a declaratory judgment action against Friend of a Friend, Inc., David Florance, and Michelle Florance (collectively "Friend") after the parties unsuccessfully attempted to negotiate a franchise renewal agreement. Friend moved for a preliminary injunction that would allow it to continue operating as a franchisee of Home Instead during pendency of the litigation. The district court denied Friend's motion, and Friend filed this interlocutory appeal. We

have jurisdiction under 28 U.S.C. § 1292(a)(1). Because we conclude the district court based its denial on a legally erroneous conclusion, we vacate and remand for the district court to reconsider Friend's motion.

## I.

Home Instead provides senior care services through a franchise system. Home Instead and Friend originally executed franchise agreements in 1997 and 1999 that allowed Friend to open two Home Instead franchises. David and Michelle Florance executed personal guarantees of the agreements  The parties renewed these agreements in 2002. In 2012, when the agreements were set to expire, Home Instead and Friend began negotiating another renewal. Home Instead attempted to raise the minimum monthly performance requirement in the renewal agreement, but Friend asserted its 2002 agreements locked in the performance requirement.

Two key provisions of the 2002 renewal franchise agreements are at issue. The first provision is section 2.F, which falls under the heading "GRANT OF FRANCHISE."[1] Section 2.F provides:

> The exclusive right to operate the Franchised Business within the Exclusive Area is contingent upon Franchisee achieving and maintaining minimum Gross Sales of Five Thousand Dollars ($5,000) in each twice-monthly billing period (Ten Thousand Dollars ($10,000) per month) by the end of the first year of operation of the Franchised Business, achieving and maintaining minimum Gross Sales of Ten Thousand Dollars ($10,000) in each twice-monthly billing period (Twenty Thousand Dollars ($20,000) per month) by the end of the third year of operation of the Franchised Business, and achieving and maintaining

---

[1]The agreements specify that "[t]he headings of the several sections and paragraphs are for convenience only and do not define, limit or construe the contents of sections or paragraphs." Appellants' App. 107 & 203.

minimum Gross Sales of Fifteen Thousand Dollars ($15,000) in each twice-monthly billing period <u>(Thirty Thousand Dollars ($30,000) per month) from the end of the fifth year of operation of the Franchised Business through the end of the term of this Agreement or any renewal term of a renewal Franchise Agreement</u> (the "Performance Standard").

Appellants' App. 75 & 171 (emphasis added).

The second key provision is section 15.A, which falls under the heading "RENEWAL OF FRANCHISE" and provides:

If, upon expiration of the initial term of the Franchise, Franchisee has during the term of this Agreement substantially complied with all its material provisions and <u>agrees to comply with the specifications and standards then applicable for new franchised businesses</u>, then Franchisee has a right to renew the franchise for an additional term equal to the then-customary initial term granted under Franchisor's then-current form of standard Franchise Agreement . . . . The franchisee <u>may choose to retain the provisions of this agreement with respect to the amount of royalty fee</u> should the then-current agreement call for a larger royalty fee.

Appellants' App. 98 & 194 (emphasis added).

During the district court proceedings, Home Instead argued that section 15.A unambiguously allows Home Instead to raise the minimum monthly performance requirement in renewal agreements, provided that the new requirement is generally applicable to all new franchises. Friend argued that section 2.F unambiguously sets the minimum monthly performance requirement at $30,000 for all franchise renewals.

The district court did not analyze whether the 2002 franchise agreements were ambiguous, stating only that Friend "concede[s] that there is no ambiguity in the provisions at issue." <u>Home Instead, Inc. v. Florance</u>, No. 8:12CV264, 2012 WL

4327041, at *4 (D. Neb. Sept. 20, 2012). It concluded, as a matter of law, that the agreements do not fix the minimum performance requirement at $30,000 for renewal agreements, but rather "give Home Instead the right to insist on new terms and conditions each time a franchise is up for renewal." Id. at *5. The court reasoned:

> When read naturally and together with the rest of the Renewal Agreement, § 2.F creates a floor, not a ceiling. For the duration of the Renewal Agreements, and for any subsequent renewal, franchisees must achieve a minimum of $30,000 in monthly gross sales. Nothing in § 2.F prohibits the franchisor from raising the minimum amount.

Id. The district court then denied Friend's motion for a preliminary injunction, holding that because the 2002 franchise agreements unambiguously support Home Instead's position, Friend's probability of success on the merits "is nil." Id. at *4.

## II.

We review a district court's ultimate ruling on a preliminary injunction for abuse of discretion, though we review its underlying legal conclusions de novo. See Barrett v. Claycomb, 705 F.3d 315, 320 (8th Cir. 2013). Whether a contract is ambiguous is a legal conclusion that we review de novo. See Neb. Pub. Power Dist. v. Midamerican Energy Co., 234 F.3d 1032, 1040 (8th Cir. 2000). A district court abuses its discretion in denying a preliminary injunction if it "rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." Barrett, 705 F.3d at 320.

We have articulated a four-factor test for determining whether to grant a motion for a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d

109, 113 (8th Cir. 1981) (en banc). While "no single factor is determinative," id., the probability of success factor is the most significant, Barrett, 705 F.3d at 320. Here, the district court evaluated only the probability of success factor, denying injunctive relief because it concluded Friend had no chance of succeeding on the merits.[2] The district court based this ruling on its underlying legal conclusion that the 2002 franchise agreements unambiguously supported Home Instead's position.

Under Nebraska law, which both parties agree applies here, a court faced with a question of contract interpretation must first determine whether the contract is ambiguous. See Bedrosky v. Hiner, 430 N.W.2d 535, 539 (Neb. 1988). "A written contract which is expressed in clear and unambiguous language is not subject to interpretation or construction," and a court simply must give effect to that language. Id. at 540. In contrast, "[w]hen it is established that a contract is ambiguous, the meaning of its terms is a matter of fact to be determined in the same manner as other questions of fact." Id.

Where both parties claim a contract unambiguously supports their respective positions, the court must determine whether the contract truly is unambiguous.[3] Cf.

_____

[2]The district court stated that for purposes of its analysis, it would "assume[] that the remaining Dataphase factors weigh in [Friend's] favor." Home Instead, 2012 WL 4327041, at *4. The court did not actually discuss or evaluate those factors.

[3]The dissent suggests that we may not evaluate whether the contract is ambiguous because "Friend concedes the contract is not ambiguous." See infra at 10. The dissent conspicuously fails to acknowledge that Home Instead and Friend both argue the contract unambiguously supports their different, respective positions, and that the district court did not adopt the interpretation that Friend advocates. The cases the dissent cites to support its argument that we may not evaluate whether the contract is ambiguous involve neither Nebraska law nor a situation where, as here, both parties claim a contract unambiguously supports their divergent positions. See Maytag Corp. v. UAW, 687 F.3d 1076, 1085 (8th Cir. 2012) (noting, in context of evaluating

C.S.B. Co. v. Isham, 541 N.W.2d 392, 396 (Neb. 1996) (evaluating whether contract construction was a question of law when "both parties argue that the contract is clear and unambiguous"). "A determination as to whether ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties . . . ." Bedrosky, 430 N.W.2d at 539. In making this determination, a court must look at the contract as a whole. Id. "A provision of a contract is ambiguous when, considered with other pertinent provisions as a whole, it is capable of being understood in more senses than one." Id.

Here, both Home Instead and Friend asserted that the 2002 franchise agreements unambiguously support their respective positions. The district court, however, did not meaningfully analyze whether the 2002 franchise agreements are ambiguous, commenting only that Friend conceded they were unambiguous. Upon de novo review, we conclude that the franchise agreements are ambiguous with respect to whether Home Instead may raise the minimum monthly performance requirement in renewal agreements.

On the one hand, the language in section 2.F stating that the $30,000 requirement applies "through the end of . . . any renewal term of a renewal Franchise Agreement," Appellants' App. 75 & 171, could be read as fixing this minimum performance requirement as long as the franchisee continues to renew its franchise agreement. On the other hand, section 15.A states that the franchisee must "agree[] to comply with the specifications and standards then applicable for new franchised

---

whether retirees had vested rights under ERISA plan, that union conceded contract "contained no unambiguous vesting language"); Rogers v. Am. Ins. Co., 338 F.2d 240, 242-44 (8th Cir. 1964) (applying Iowa law and engaging in lengthy analysis of whether contract was unambiguous before rejecting plaintiff's contention that contract was ambiguous); Pet Milk Co. v. Boland, 175 F.2d 151, 156-58 (8th Cir. 1949) (evaluating, under Missouri and Arkansas law, whether jury was properly instructed about determining which document parties intended to be a contract).

businesses" in order to renew a franchise agreement, with the exception that the franchisee "may choose to retain the provisions of this agreement with respect to the amount of royalty fee . . . ." Appellants' App. 98 & 194. This language could be read as requiring the franchisee to agree to all standardized terms in franchise renewals, except for royalty fees.

When these provisions are read together, one reasonable interpretation of the franchise agreement could be that both section 2.F and section 15.A address the same subject—permissible terms for renewal contracts—and that section 2.F thus prevails over section 15.A with respect to minimum performance requirements in renewal contracts because it is more specific. See Krzycki v. Genoa Nat'l Bank, 496 N.W.2d 916, 922 (Neb. 1993) ("Where general and specific terms in a contract may relate to the same thing, the more specific provision controls."). However, section 15.A explicitly allows franchisees to retain royalty fee provisions in renewal contracts but makes no mention of performance requirements. Thus, another reasonable interpretation could be that section 2.F merely specifies that minimum performance requirements in renewal contracts will be at least $30,000 per month, while section 15.A gives Home Instead the authority to raise those minimum requirements as long as the higher requirements are generally applicable to new franchised businesses.[4] See Davenport Ltd. P'ship v. 75th & Dodge I, L.P., 780 N.W.2d 416, 428 (Neb. 2010) ("The expression of one thing implies the exclusion of another . . . .").

Because sections 2.F and 15.A, when read together, are subject to at least two reasonable interpretations, the franchise agreement is ambiguous as to whether Home

---

[4]We consequently reject Friend's argument that Home Instead's proposed interpretation would necessarily render superfluous the agreement language referring to "any renewal term of a renewal Franchise Agreement."

Instead can raise the minimum performance requirement in renewal contracts.[5]  See Luschen Bldg. Ass'n v. Fleming Co., 415 N.W.2d 453, 458 (Neb. 1987) (holding contract was ambiguous when one section "seem[ed] to impose absolute liability . . . to maintain and repair the parking lot" but "this repair liability could be seen as limited by" other sections).  Due to this ambiguity, construction of the franchise agreement is a question of fact.  See Bedrosky, 430 N.W.2d at 540.  Consequently, the district court erred in concluding that the contract was unambiguous and that, as a matter of law, the contract allows Home Instead to raise the minimum performance requirement in renewal contracts.

Because the district court's denial of Friend's motion for a preliminary injunction was based on this erroneous legal conclusion, the denial was an abuse of discretion.  See Barrett, 705 F.3d at 320.  However, the fact that the district court's decision was an abuse of discretion does not mean that Friend automatically is entitled to a preliminary injunction.  Rather, Friend is entitled to a preliminary injunction only if the Dataphase factors, on balance, weigh in Friend's favor.  See Dataphase, 640 F.2d at 113.  Friend asks this Court to conduct its own four-factor Dataphase analysis and reach a conclusion regarding the preliminary injunction, while Home Instead requests a remand for the district court to conduct the analysis in the first instance.

Friend has identified one case where this Court conducted its own Dataphase analysis even though the district court had not addressed all of the Dataphase factors. See Coteau Props. Co. v. Dep't of Interior, 53 F.3d 1466, 1480-81 (8th Cir. 1995). However, the more common approach is to remand for the district court to conduct the full analysis in the first instance.  See, e.g., Lankford v. Sherman, 451 F.3d 496, 513 (8th Cir. 2006) (remanding for further proceedings when district court had not

---

[5]We do not suggest that these are the only two reasonable interpretations of the franchise agreement.

considered all four <u>Dataphase</u> factors); <u>Blue Moon Entm't, LLC v. City of Bates City, Mo.</u>, 441 F.3d 561, 566 (8th Cir. 2006) (same); <u>Dataphase</u>, 640 F.2d at 114 (same).

Here, because the district court did not address three of the four <u>Dataphase</u> factors, it did not make any findings of fact concerning the effect of a preliminary injunction on Home Instead, Friend, or the public. Moreover, because the district court's analysis of the probability of success factor was based on an erroneous legal conclusion, the district court did not have the opportunity to evaluate this factor under the proper legal framework. "The district court is in the best position to evaluate all of the evidence and weigh the factors to determine whether the injunction should issue," <u>Lankford</u>, 451 F.3d at 513, and we vacate and remand the case for the district court to do so.

### III.

Accordingly, we vacate and remand for the district court to conduct a full <u>Dataphase</u> analysis consistent with this opinion and to reconsider Friend's motion for a preliminary injunction.

RILEY, Chief Judge, dissenting.

Because the district court correctly analyzed the facts and applied Nebraska law in denying Friend's motion for preliminary injunction, I respectfully dissent for the reasons stated in the district court's order.

The panel majority incorrectly claims the district court "only" evaluated one <u>Dataphase</u> factor—factor three—the "probability of success . . . on the merits." <u>Ante</u> at 5. The district court adequately evaluated all four <u>Dataphase</u> factors and assumed, for purposes of the motion, that all of the factors favored Friend, except for factor

three.  The district court then expressly determined Friend was not entitled to relief because Friend could not (1) demonstrate a probability that Friend would succeed on the merits, and (2) the remaining factors were insufficient to justify the "extraordinary remedy" of a preliminary injunction.  Roudachevski v. All-Am. Care Ctrs., Inc., 648 F.3d 701, 705 (8th Cir. 2011) (explaining a preliminary injunction is "an extraordinary remedy"); Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993) ("[A] preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted.").

Friend failed to demonstrate a probability of success on the merits because the plain language of the contract unambiguously contradicts Friend's argument.  See Ruble v. Reich, 611 N.W.2d 844, 850 (Neb. 2000) ("The terms of a contract are to be accorded their plain and ordinary meaning as ordinary, average, or reasonable persons would understand them.").  Friend concedes the contract is not ambiguous, and, notwithstanding the panel majority's critique, ante at 6, the district court may accept that concession, as we ourselves frequently and consistently do.  See, e.g., Maytag Corp. v. UAW, 687 F.3d 1076, 1085 (8th Cir. 2012); Rogers v. Am. Ins. Co., 338 F.2d 240, 244 (8th Cir. 1964); Pet Milk Co. v. Boland, 175 F.2d 151, 158-59 (8th Cir. 1949).  When the parties argue different contract interpretations, that debate does not necessarily make the contract ambiguous.  See Knox v. Cook, 446 N.W.2d 1, 4 (Neb. 1989) ("The fact that parties to a document have or suggest opposing interpretations of the document does not necessarily, or by itself, compel the conclusion that the document is ambiguous.").  Only the panel majority finds an ambiguity here.[6]

---

[6]The majority opinion in footnote 3 misses my point: we always may accept a concession by a party—here, non-ambiguity. Of course, we may evaluate whether the contract language is ambiguous, which the district court did, and in which I concur. The district court rejected both parties' interpretations and itself interpreted the language of § 2.F.  Further evaluation of the parties' respective interpretations is unnecessary because the provisions of § 2.F. use "clear and unambiguous language." Bedrosky v. Hiner, 430 N.W. 2d 535, 539 (Neb. 1988).

When the contract has no ambiguity, the contract's interpretation, viewing the contract as a whole, becomes a question of law. Ruble, 611 N.W.2d at 850. Although Friend conceded lack of ambiguity and did not discuss ambiguity in any detail, the district court, contrary to the majority opinion's reference, ante at 6, did "meaningfully analyze whether the 2002 franchise agreements are ambiguous." The district court thoroughly analyzed the contract language and determined the provisions of § 2.F., when "read naturally and together" with the provisions governing renewals, contravened Friend's "strained" interpretation. As the district court explained, "§ 2.F[.] creates a floor, not a ceiling." The district court reasoned—Section 2.F. does not prohibit Home Instead

> from raising the minimum amount. A minimum of $70,000 includes, and is not inconsistent with, a minimum of $30,000.
>
> . . . .
>
> Home Instead may . . . continue to update the standard requirements for new franchises, and insist that renewing franchises conform. This serves two important functions. First, it allows Home Instead to maintain relatively uniform franchise agreements. . . . Second, it prevents Home Instead from being stuck with terms that have ceased being profitable or are failing to account for current market conditions.
> . . . .
>
> [Friend] cannot demonstrate any probability that they will succeed on the merits. This is the 800-pound gorilla in the room, and it is not going to budge, even if the remaining *Dataphase* factors all joined in pushing.
>
> I agree. I would affirm the well reasoned judgment of the district court.

_____